**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| JARROD HORTON, | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | JUDGE DOW |
| | ) | |
| CITY OF CHICAGO, et. al. | ) | Case No. 13 CV 6865 |
| Defendants. | ) | |

**DEFENDANTS' JOINT RULE 56.1(a)(3) JOINT STATEMENT OF
UNCONTESTED MATERIAL FACTS IN SUPPORT OF THEIR
MOTIONS FOR SUMMARY JUDGMENT AGAINST PLAINTIFF**

Defendants, City of Chicago ("City"), Kenneth Walker ('Walker"), Shaquila Moore ("Moore"), and Maverick Security, Inc. ("Maverick"), by and through their respective attorneys, submit this joint statement of material facts, pursuant to Local Rule 56.1(a)(3), to which there is no genuine dispute and which entitle defendants to judgment as a matter of law.[1] The pleadings, deposition transcripts, video recordings, and other exhibits cited to in this statement are attached hereto.

**PLEADINGS**

1. Plaintiff filed his twelve-count Fourth Amended Complaint on October 6, 2015 against Defendants City, Walker, Moore, CHA, Russell, and Maverick, alleging: :(1) excessive force against Walker pursuant to 42 U.S.C. § 1983 ("Section 1983"), alleging that Walker "subjected decedent Marlon Horton to excessive force, namely, by fatally shooting him" ("Count I"); (2) Section 1983 failure to intervene to prevent the shooting against Moore ("Count II"); (3) Section 1983 failure to provide medical care against Walker and Moore,

---

[1] These facts are undisputed only for purposes of Defendants' Motions for Summary Judgment. Defendants reserve the right to dispute any and all of these facts for all other purposes, including trial.

pursuant to § 1983 ("Count III"); (4) Section 1983 conspiracy to violate Horton's constitutional rights against Walker and Moore ("Count IV"); (5) state law intentional infliction of emotional distress against Defendants ("Count V"); (6) state law wrongful death against Defendants ("Count VI"); (7) state law battery against Defendants ("Count VII"); (8) state law negligent supervision against Russell and Maverick ("Count VIII"); (9) Section 1983 policy claim against the City ("Count IX"); (10) Section 1983 policy claim against CHA ("Count X"); (11) Indemnification against the City and CHA ("Count XI"); (12) Respondeat superior liability against Russell, Maverick, the City and CHA ("Count XII"). Exh. A (Fourth Amended Complaint, Dkt. 128).

2.    CHA filed crossclaims against Russell and Maverick for contribution.  Exh. B ("Chicago Housing Authority's Crossclaims for Contribution Against H.J. Russell & Company and Maverick Security, Inc.," Dkt. 125)

3.    Russell filed crossclaims against CHA for contribution and against Maverick for contribution, express indemnification, and implied indemnification. Exh. C ("H.J. Russell & Co.'s Crossclaim for Contribution, Indemnification, and Implied Indemnification," Dkt. 130)

4.    Maverick filed crossclaims against CHA and Russell for contribution.  Exh. D ("Crossclaim of Maverick Security, Inc., for Contribution Against H.J. Russell & Company and the Chicago Housing Authority," Dkt. 162)

5.    This court has jurisdiction of this action pursuant to 28 U.S.C. §§1331, 1343 and 1367.  Exh. A at ¶2.

6.    Venue is proper under 28 U.S.C. §1391(b).  Exh. A at ¶3.

## PARTIES

7.     CHA contracted with Russell to manage a property at 1815 W. Monroe ("the property").
Exh. E (Private Property Management Agreement Between The Chicago Housing Authority
and H J Russell & Company, "CHA Contract," previously marked as exhibit to "H.J. Russell
& Co.'s Crossclaim for Contribution, Indemnification, and Implied Indemnification," Dkt.
130-2.

8.     Russell subcontracted with Maverick to provide security services at the property.  Exh. F
(2011 Subcontract Agreement), Exh. G (January 2013 Letter of Agreement), and Exh. H
(December 2014 Service Agreement), previously marked as exhibits to "H.J. Russell & Co.'s
Crossclaim for Contribution, Indemnification, and Implied Indemnification," Dkt. 130-3,
130-4 and 130-5, respectively.

9.     Walker was an employee of the Chicago Police Department at the time of this incident.
Deposition of Kenneth Walker, Exh. I, at 20:1-7.

10.     Walker was off-duty with the Chicago Police Department at the time of this incident, having
finished his shift at 11pm the night before.  Exh. I at 20:1-7.

11.     Walker was employed by Maverick and was working as a security guard at the property on
the morning of September 7, 2013.  Exh. I at 19:11-19, 108:24-109:2.

12.     Moore was employed by Maverick and was working as a security guard at the property on
the morning of September 7, 2013.  Deposition of Shaquila Moore, Exh. J, at 14:22-15:3,
19:7-9, 194:3-8.

## SURVEILLANCE VIDEO

13.     On September 7, 2013, CHA security analyst Brian Frost reviewed archived video from
surveillance cameras at the property, downloaded relevant video to his hard drive, and saved

the video to discs which he provided to the Chicago Police Department. Deposition of Brian Frost, Exh. K at 51:19 - 52:5, 59:15 - 59:24, 65:5 - 65:22.

14. Video downloaded by Brian Frost included one interior camera view and two views from exterior cameras on the corners of the building. Deposition of Anthony Powell, Exh. L, at 98:2-15.

15. The exterior cameras Brian Frost reviewed showed the response of police and fire to a man who had been injured, but did not show how the man came to be injured. Exh. K at 64:6-16, 86:19- 87:9. An interior camera with a view through the lobby doors showed a dispute between and man and two security guards. Exh. K at 64:17 - 65:1.

16. Exhibit M is a genuine and authentic copy of video from the interior lobby surveillance camera at the property on the morning of September 7, 2013, beginning at approximately 6:31 a.m., which was archived to the CHA file server, downloaded by Frost and reviewed by Anthony Powell on September 7, 2013. Affidavit of Anthony Powell, Exh. P at ¶6.

17. Exhibit N is a genuine and authentic copy of video from the northeast corner surveillance camera at the property on the morning of September 7, 2013 which was archived to the CHA file server, downloaded by Frost and reviewed by Anthony Powell on September 7, 2013. Exh. P at ¶8.

18. Exhibit O is a genuine and authentic copy of video from the southeast corner surveillance camera at the property on the evening of September 6 and morning of September 7, 2013 which was archived to the CHA file server, downloaded by Frost and reviewed by Anthony Powell on September 7, 2013. Exh. P at ¶9.

19. Exhibit M fairly and accurately represents the actions of the individuals depicted therein, including Horton, Walker, and Moore. Exh. I at 213:1-15, 272:5-8, Exh. J at 9:1-6; Walker affidavit, Exh. Q.

20. Exhibit M captured much of the interaction between Horton, Walker and Moore prior to the shooting. Exh. M at approximately 0:47 – 4:15.

21. In Exhibit M, Horton is the male individual wearing a white sleeveless shirt over a green short-sleeved shirt and white pants; Walker is the male individual wearing a white tee shirt and dark pants; and Moore is the female individual wearing a black hooded sweatshirt and black pants. Exh. Q at ¶4.

22. Archived recordings from the surveillance cameras contain a timestamp on the bottom, but it may not be accurate. Exh. K at 137:16 – 138:15.

23. The surveillance cameras on the property did not record audio. Exh. K at 36:23-37:2.

24. Surveillance cameras at the property had motion-activated systems for archiving video footage such that sufficient motion within the camera frame was required to trigger archiving of video for later viewing. Exh. K, at 34:2-34:4, 87:15-89:16.

25. Surveillance cameras were always recording, but without sufficient motion to trigger archiving to the hard drive, the recording would be permanently erased after a few seconds. Exh. K at 34:21 - 35:13.

26. The exterior cameras at the property were sensitive to low light conditions, and may have been triggered to archive when there was no activity in the frame, due to the camera recording in black and white and perceiving the blurriness of the low light conditions as motion. Exh. K at 127:2-16, 138:20 - 139:18.

27. When a camera senses sufficient motion such that archiving should occur, the camera archives several seconds prior and many seconds after the motion stops. Exh. K at 150:3-20.

28. The surveillance camera in the lobby captured interaction between Walker, Moore and Horton, but some events took place off camera. Exh. I at 213:1-15, Exh. M.

29. Archived video from the northeast corner camera shows the camera was positioned facing westbound, recording along the north side of the building, until a timestamp of approximately 6:39 am. Exh. K at 164:16 – 165:6, Exh. N at approximately 00:45.

30. At a timestamp of approximately 6:39 am, the camera mounted on the northeast corner of the building was manually panned to face southbound, recording along the east side of the building. Exh. K at 164:16 – 165:15. Exh. N at approximately 00:45-00:46.

31. Archived video from the northeast corner camera showed Horton and Moore after the shooting had taken place, as well as police and fire response; it did not show Horton, Walker, or Moore prior to the shooting. Exh. K at 86:24 -87:8, 64:6-16. Exh. N at approximately 00:46, et. seq.

32. Archived video from a surveillance camera located at the southeast corner of the property shows the camera facing north, recording the east side of the building at approximately timestamp 6:12 a.m., after which there is a gap in the video until approximately timestamp 6:40 a.m. Exh. K at 142:6-11. Exh. O at approximately 05:34:19 - 05:34:37.

33. The arrival of emergency vehicles at approximately 6:40 am on the timestamp triggered archiving of video on the southeast corner camera. The presence of people in front of the building was insufficient to trigger archiving. Exh. K at 146:4-6, 146:19- 147:6. Exh. O at approximately 05:34:37.

34. Archived video from the southeast corner surveillance camera does not show Horton, Walker, or Moore prior to the shooting. Exh. K at 66:6-16, 64:11-14 86:24-87:8, Exh. O at approximately 05:34:19 - 05:34:37.

35. There is no archived video from timestamp 6:12 to 6:40 am from the southeast corner surveillance camera because any motion in the camera frame was not sufficient to trigger archiving. Exh. K at 145:15-20.

36. It is not possible that somebody deleted video from the southeast corner camera between approximately 6:12 and 6:40 am on the timestamp. Exh. K at 151:16-19.

37. It is not possible that the archived video from the southeast corner camera is actually two videos spliced into one. Exh. K at 151:20-22; Deposition of Lt. Dwain Williams, Exh. R, at 180:23 - 181:10.

38. Archived video from the northwest camera contains an automated "camera tampering" bookmark, which does not necessarily indicate physical tampering occurred. Exh. R at 123:2-15; 124:17-19, Affidavit of Mathieu D'Arsigny, Exh. S, at ¶¶5-6. The camera tampering bookmark may have been caused by a partial or complete obstruction of the camera view, a sudden change of field of view, or a loss of focus. Exh. S at ¶¶ 7-8.

39. Employees of the City of Chicago Office of Emergency Management and Communication and Chicago Police Department do not have the ability to alter, or delete video recorded by any cameras at the property. Exh. R at 176:12- 177:3.

40. (Omitted. Exhibit T also omitted.)

## THE INCIDENT

### Horton refuses to leave CHA property, publically urinates, and threatens officers with physical violence

41. At approximately 6:00 a.m. September 7, 2013, Moore observed Marlon Horton ("Horton") asleep in the vestibule of the building. Exh. J at 194:3-13.

42. Moore woke Horton, identified herself as building security, and told him he couldn't sleep there, he had to leave. Exh. J at 195:19-24; Exh. I at 179:4-8; Deposition of Anthony Whooper, Exh. U, at 23:17-21; 25:21-26:8.

43. Walker also entered the vestibule and told Horton he couldn't sleep there, he had to leave. Exh. I at 173:3-11, 179:14-22.

44. Horton cursed at Walker, walked out of the building, and began urinating on the sidewalk in front of the building. Exh. I at 188:17-18, 192:6-10; Exh. J at 203:19-23, 213:7-22; Exh. U at 24:5-14, 26:13-20; Exh. M at approximately 00:49-00:58.

45. Walker and Moore stood nearby and told Horton he had to leave CHA property. Exh. I 193:10-15; at Exh. J at 217:15-21; Exh. M at approximately 01:06 – 02:09.

46. Horton then began pulling on the doors of a parked car which belonged to Officer Walker saying "This is my people's shit." Exh. I at 224:23-225:6; Exh. J at 221:8-11, 221:15-20; Exh. M at approximately 02:09-02:18.

47. Walker and Moore calmly stood by and continued to ask Horton to leave the property. Exh. J 232:20-24; Exh. I at 225:7-11. Exh. M at approximately 01:06 – 02:18.

48. Horton responded, "Make me leave," "Make me, I'll kick both of y'all asses. You ain't got shit." Exh. I at 217:7-13, 236:8-12

49. Moore said to Walker "maybe we got to detain him." Exh. J at 222:8-14.

50. Walker told Horton he would be arrested if he didn't leave. Exh. I at 226:19-227:1.

51. Horton said "I don't give a fuck" and "You is the bitch-ass police. You ain't going to do shit." Exh. I at 227:5-9.

52. Walker presented his police badge, announced he was a police officer, and told Horton he was under arrest. Exh. I at 228:11-20, 231:11-12; Exh. J at 233:7-21

53. Horton turned toward Walker and said "Lock me up motherfucker. Try. Bring it on." Exh. I at 231:11-14.

### Horton threatens and physically assaults Moore and Walker

54. After he was told he was under arrest, Horton responded "Come get me, then" "You ain't going to do shit" "I will fuck you up" and "I'll knock your ass out" as he stepped toward Walker. Exh. I at 242:11-20; Exh. J at 233:17- 234:1.

55. As Horton closed in on Walker, Moore moved closer to Horton and Walker and said "no." Exh. J at 234:18-23, 236:19-24; Exh. M at approximately 02:32 -02:36.

56. Horton turned and started walking toward Moore threatening "Bitch I'll knock you out." Exh. J at 241:15-20; Exh. I at 246:24 247:12; Exh. M at approximately 02:40-02:54.

57. Moore backed away from Horton. Exh. I at 247:8-12; Exh. J at 241:21 - 242:4; Exh. M at approximately 02:52-02:54.

58. As Horton was moving toward Moore, Walker kicked the lower part of Horton's leg, causing Horton to stumble slightly. Exh. I at 247:8-16, 248:5-8; Exh. J at 243:9-15; Exh. M at approximately 02:54.

59. Horton rushed Walker. Walker backed away, raising and kicking his leg as Horton approached. Exh. I at 257:21-258:3; Exh. J at 247:24- 248:7; Exh. M at approximately 02:54-02:57.

60. Horton grabbed and twisted Walker's leg, knocking Walker to the ground. Exh. I at 257:21-258:3; Exh. J at 247:24- 248:7; Exh. M at approximately 02:57-03:04.

61.  Horton began punching Walker while he was on the ground. Exh. I at 258:4-10, 258:17-259:1; Exh. J at 248:16-20, 250:10-15; Exh. M at approximately 03:02.

62. Moore tried to pull Horton off Walker, by grabbing his shoulders and swinging at him with her hands. Exh. J at 248:12-15, 251:1-3; Exh. I at 258:4-10; Exh. M at approximately 02:54-03:04.

63. Horton grabbed Moore's braids and ripped her natural hair out by the roots. Exh. I at 258:11-13, 262:16-263:5; Exh. J at 251:6-8, 251:21-23;  Exh. M at approximately 03:03-03:05.


**Horton threatens to disarm and kill officers**

64. After her hair was pulled out, Moore pulled her weapon and pointed it at Horton to protect herself, backing into the parking lot as Horton walked toward her. Exh. I at 263:16-18; Exh. J at 252:5-8; Deposition of Tawanda Stange, Exh. V, at 34:16-35:6; Exh. M at approximately 03:05 - 03:11.

65. Tawanda Stange watched from her second-story window as Horton moved toward Moore. Moore was saying "back up, back up I don't want to have to shoot you" and Horton responded, "Bitch. Fuck you. I don't care about that gun. I'm going to beat your ass again." Exh. V at 35:14-17, 35:22-36:15, 36:23-37:14. Horton also said, "That gun ain't shit", and "bitch you ain't about that life" as he backed Moore down.  Exh. J at 252:14-24.

66. Ms. Stange interpreted Horton's actions in advancing on the officers as trying to take their weapons. Exh. V at 62:17 – 63:11.

67. Ms. Stange observed that Horton was very aggressive toward the officers. Exh. V at 64:23 - 65:3.

68. After he was knocked to the ground, Walker stood and immediately drew his weapon and pointed it at Horton. Exh. I at 263:13-15; 264:20-22; Exh. M at approximately 03:09.

69. Horton threatened to take the weapons from Walker and Moore, saying "That don't mean shit to me I'll take your guns and shoot you with them." Exh. I at 263:24-264:14, 264:23 - 265:1; Exh. J at 252:17-20; Exh. V at 63:2-7.

70. Walker approached Horton with his gun drawn, and told Horton to get down on the ground, and that he was under arrest. Horton responded "Fuck that" "I don't give a shit" "Come get me" "I'll kill both of y'all." Exh. I at 263:19 - 264:3. Exh. M at approximately 03:09-03:13.

71. The entire time Walker and Moore had their weapons drawn, Horton chased Walker and Moore, alternating between them while Walker and Moore backed up. Exh. I at 273:23-274:10; Exh. J at 268:5-14; Exh. M at approximately 03:05, *et. seq.*

72. Horton threatened to kill both Walker and Moore. Exh. I at 243:14-19.

73. As he pursued them, Walker was constantly threatening to take their weapons and shoot Walker and Moore. Exh. I at 273:23-274:5.

74. Tawanda Stange described the encounter as "like a volley" Horton advanced on whichever officer spoke to him, and the officer backed up with gun drawn. Exh. V at 40:14-22.

75. Horton did not appear afraid or worried at all that guns were pointed at him; rather, Horton seemed enraged and hell bent on fighting and hurting the officers. Exh. V at 32:13, 39:2-5, 39:12-40:13; Exh. M at approximately 03:05, *et. seq.*

**Horton attempts to disarm Moore**

76. Horton advanced on Walker as he backed away with his weapon directed at Horton. Exh. M at approximately 03:14 – 03:31.

77. Horton turned toward Moore, and she backed away out of frame of the camera. Exh. I at 288:11-21; Exh. M at approximately 03:31-03:32.

78. As Horton moved toward Moore, he was talking and punching his fist into his hand. Exh. M at approximately 03:32-03:33.

79. Stange heard Horton make several threatening statements to Moore, including threatening to beat her up and take her gun. Exh. V at 132:12-23.

80. Horton followed Moore out of range of the camera. Exh. M at approximately 03:31-03:38.

81. Joe Powell looked out his fourth floor window and saw a confrontation between a man and the female security guard (Moore). Deposition of Joe Powell, Exh. W, at 18:11-14. Mr. Powell had seen the man asleep in the vestibule earlier. *Id*. at 12:18-21, 13:14-18. Moore had her gun drawn and Mr. Powell heard her yell "if you come any closer to me I'm gonna shoot you." *Id*. at 19:10-14. Horton yelled that he wasn't afraid to die, he was ready to die. *Id*. at 19:15-17.

82. Joe Powell described Horton's demeanor during this exchange as agitated and angry, and Moore appeared distressed, very upset. Exh. W at 26:24-27:9, 27:18-22.

83. Mr. Powell last saw Horton walking along the sidewalk at which point Powell walked away from his window, intending to go downstairs to see if he could help. Exh. W at 24:24-25:6, 26:2-7, 21:21-22:1. He did not see all of the interaction between Moore and Horton. *Id*. at 22:7-16. Mr. Powell put his clothes on and was at his door when he heard the gunshot. *Id*. at 22:17-24.

84. Horton charged Moore, grabbing her in a bear hug, with his arms almost all the way around her. Exh. I at 288:11-21, 355:24 - 356:10, 357:23-358:9, 360:7-14.

85. Horton reached for Moore's weapon, and Moore turned her body, trying to shield her weapon. Exh. I at 288:11-21, 293:14-15, 294:18-20, 358:10-17, 360:7-14, 362:24-363:12.

86. Moore was shaking, and Horton commented "Bitch, you scared. I got your ass. And I'm gonna take this motherfucker. . ." Exh. I at 288:11-21.

87. Anthony Whooper, who worked at the building as a janitor, was on the other side of the building and heard Moore (who he knew as "Shaq") shouting "Get off me, it don't got to be like this." Exh. U at 12:13-19, 29:24-30:16.

88. Moore sounded scared and distressed, and Whooper had "the impression that they was tussling or he was trying to come up on her." Exh. U at 32:5-18.

89. Walker ran over, shoved Horton with his elbow, and succeeded in getting him away from Moore. Exh. I at 293:4-294:1, 360:15-17, 361:1-4, 363:16-20.

90. When Horton and Moore were struggling, Walker did not shoot Horton because Moore was in his line of fire. Exh. I at 293:16-20.

91. Moore has no memory of Horton grabbing for her gun, but remembers that Horton was backing her down, rushing at her, and Walker did something to get him off of her. Exh. J at 253:1-255:5; 286:6-287:8.

92. There is a 16-second skip in the video during which this incident took place off camera. Exh. M at approximately 03:50-03:51. Exh. I at 214:10-14 (incident lasted 15 to 30 seconds).

93. Walker's shove caused Horton to step back, and Walker retreated to give him some distance. Exh. I 361:14-362:1, 363:13 - 364:3.

**Horton attempts to disarm Walker, and Walker responds with deadly force**

94. After Walker shoved Horton away from Moore, Horton started coming after Walker.  Exh. I at 295:1-2.

95. Horton turned to Walker and said "What you going to do, puss-ass nigger?  I'll kill you." And then he rushed him. Exh. J at 255:9-13, 301:22-302:2.

96. Horton pursued Walker around the parking lot, telling him he was going to take his weapon and kill him with it.  Exh. I at 295:6-9, 296:15-23, 298:3-18; 308:12-18; Exh. M at approximately 03:55-04:14.

97. Horton was at times closer than 3-5 feet from Walker as he pursued him around the parking lot.  Exh. I at 308:12-15; Exh. M at 4:09.

98. While Horton was pursuing Walker around the parking lot, Walker was backing away.  Exh. I at 274:6-9;  Exh. M at approximately 03:55-04:14.

99. Walker was afraid Horton would get his weapon, he pleaded with Horton "don't do this, I'm going to put you down." Exh. I at 295:24 - 296:2, 298:3-18.

100. Horton and Walker passed in front of the lobby doors as Walker was backing away from Horton.  The lobby video shows them approximately one sidewalk square apart, a distance of 60 inches, or five feet. Affidavit of Lucien Haag, Exh. X at ¶12 and exh. 2, fig. 1a; Exh. M at approximately 04:12.

101. Both Walker and Horton passed through an area where the lobby video camera's view was obstructed by a central pillar between the double doors, creating a "zone of obscuration" which ranged from 52 inches (4' 4") wide adjacent to the building to 76 inches (6' 4") wide at the curb. Exh. X at ¶¶13-15 and exh. 2 at p. 2, fig. 3; Exh. M at approximately 04:12-04:15.

102. Horton was within approximately three to five feet of Walker seconds before the shooting. Exh. I at 303:8-19.

103. Horton was saying "I'm·going to take that weapon. I'm going to take that·weapon and shove it up your ass.· I'm going to take that·weapon and shoot you with your own goddamn weapon." Exh. I at 305:23 - 306:7.

104. Walker believed Horton was serious about those threats. Exh. I at 306:8-13.

105. Horton reached for Walker's weapon. Exh. I at 303:15-16, 305:11-13; Exh. J at 301:15-19.

106. Horton was three to five feet away from Walker when he reached for his weapon. Exh. I at 303:8-19.

107. Horton's hand was extremely close to Walker's weapon, maybe a foot away. Exh. I at 305:23-306:2.

108. Walker hopped back as he raised his weapon and fired a single shot which struck Horton in the chest. Exh. I at 305:14-22; Exh. J at 301:15-21; Exh. M at approximately 04:14 - 04:16.

109. Horton was seven to eight feet away from Walker and five to six feet away from the weapon in Walker's outstretched arm at the time of the shooting. Exh. X at ¶16; Exh. M at approximately 04:15.

110. When Walker hopped back immediately prior to firing, he increased the distance between himself and Horton by approximately two feet. Exh. X at ¶19; Exh. M at approximately 04:14-04:15.

111. Horton's stride was approximately 30 inches long. He could advance seven feet in three quick steps, which could take one second. Exh. X at ¶17-18.

112. A person of Horton's size can reach with an outstretched arm and hand and shorten the separation distance by nearly three feet. Exh. X at ¶20.

15

113. Horton was in a forward leaning position at the time he was shot. He was not in a leaning away or avoidance posture. Exh. X at ¶¶21-22.

114. Because of the firing mechanism on Walker's revolver, if Horton had grabbed Walker's revolver, his grasp on the revolver could have rendered the revolver temporarily incapable of firing. Exh. X at ¶23.

115. If wrested away from Walker, the revolver would have been fully capable of firing. Exh. X at ¶23.

116. Tawanda Stange heard the shot and looked out the window, but did not see either Walker or Horton, and did not know who had been shot. Exh. V at 53:2-8. She went downstairs to see who had been shot. *Id*. at 53:2-8, 75:5-7

## Maverick Had No Reason To Supervise, Train, Discharge, Or Refuse To Hire Walker Or Moore

118. Maverick conducted a criminal background check and a drug test with respect to Moore prior to her employment that was found to be acceptable. (Deposition of Shaquila Moore, Exhibit J at 54:22-24, 55:1-10.)

119. Moore was a licensed security guard and held a firearms permit when Maverick hired her. Exh. J at 15:2-24, 25:17-24, 26:1-8, 27:18-24, 48:16-19.

120. Moore had worked as a security guard for a private security company, K-9 Security, prior to working for Maverick. Exh. J at 12:22-24, 13:1-15.

121. Moore had not been the subject of any disciplinary actions with any of her employers prior to Maverick. Exh. J at 13:16-22.

122. Moore was never the subject of any disciplinary actions while at Maverick. Exh. J at 53:14-21.

123. In the training for her license and firearms permit, Moore received training regarding the general duties of a security guard Exh. J at 25:9-16, 26:9-13, 28:1-4, 8-24, 29:1-20), takedown moves Exh. J at 27:2-5), firearms training Exh. J at 28:5-7), handling criminal activity Exh. J at 29:21-24, 30:1-3, 31:23-24, 32:1-2), and use of force Exh. J at 34:20-22, 40:3-7).

124. Prior to the incident with Horton, Moore had never used physical force with anyone while working with Maverick. Exh. J. at 150:8-16.)

125. Moore never fired her weapon Exh. J at 143:7-9), and prior to the incident with Horton, Moore had never taken her weapon from her holster while working at Maverick Exh. J at 143:10-13).

126. Officer Walker has been a Chicago Police Officer since 1997. Exh. I at 15:23-23, 16:1.)

127. Prior to becoming a police officer, Officer Walker was a corrections officer with the Cook County Sheriff's department, where he carried a weapon but never fired or drew his weapon. Exh. I at 13:23-23, 14:4-12, 22-24.

128. Officer Walker had been working at Maverick for three or four years before the incident with Mr. Horton. Exh. I at 22:3-8.

129. Officer Walker had never been subject to any disciplinary actions by the Cook County Sheriff's department. Exh. I at 14:18-21.

130. Officer Walker had never been subject to any disciplinary actions by the Chicago Police Department. Exh. I at 17:7-10.

131. Officer Walker had never been subject to any disciplinary actions by Maverick. Exh. I at 70:8-20.)

132.    Officer Walker graduated from the Chicago Police Academy where he received training on the use of force and weapons. Exh. I at 16:15-24, 26:7-15, 19-24, 27:1-6, 65:7-11.

133.    Officer Walker received training from the Cook County Sheriff's department on law enforcement techniques, weapons, and the use of force. Exh. I at 16:2-14.

134.    Other than the incident with Horton, in his employment with Maverick Officer Walker had never used physical force with anyone Exh. I at 96:10-13), and never fired or displayed his weapon Exh. I at 88:22-24, 89:1-5).

135.    Officer Walker fired his weapon only one other time as a Chicago Police Officer, which was 10 years ago in a carjacking incident. Exh. I at 40:17-24.

136.    Walker has never been arrested or charged with a crime. Exh. I at 385:17-20.)

137.    Dr. Bobby Morris is the sole owner of Maverick Security. (Deposition of Dr. Bobby Morris, Exhibit Y, at 12:9-11.

138.    Dr. Morris is not aware of any incident, other than the one with Horton, where a security officer's verbal commands did not control the incident. Exh. Y at 111:11-17.

139.    Dr. Morris is not aware of any incident, other than the one with Horton, where a Maverick Security guard discharged their weapon. Exh. Y at 135:3-9.

### Moore Was Not Acting Under Color Of Law

140.    Moore's position at Maverick was as an armed security officer. Exh. J. at 24:23-24.

141.    Maverick's job description for its security officers was consistent with the training Moore received to obtain her security guard license, which was to observe and report, look for loitering, trespassing, criminal activity, and provide for the resident's safety. Exh. J at 25:1-16, 55:16-24, 57:3-12.

142.    Moore did not have the power to arrest persons. Exh. J at 222:17-24, 227:9-11, 21-23.

143. Moore did not understand precisely what the power to arrest consists of other than it is something a police officer can do Exh. J at 227:12-20, 228:6-7.

144. Moore was trained by Maverick to call 911 for medical and police assistance Exh. J at 51:9-13, 53:22-24, 112:1-13.

145. Moore's intent with respect to Mr. Horton was to detain him, place him in handcuffs, and call 911. Exh. J at 224:12-16.)

146. The only other detention that Moore performed while with Maverick was the detention of a female who had been smoking in the stairwell of the Henry Horner Homes, where Moore handcuffed her, walked her to the security desk, and called 911 to have the Chicago Police Department arrest the person. Exh. J. at 143:14-24, 144:1-5, 8-24, 145:1-24, 149:8-24, 150:1-4, 155:8-13, 166:1-6.)

147. On September 7, 2013, Moore was wearing her Maverick-issued black uniform shirt that said "Maverick Security", her Maverick Security ID badge, black bottoms, her weapon, her handcuffs, and black shoes. Exh. J at 71:4-8, 190:9-11, 191:11-19, 237:23; 365:20-24, 366:1-9; Exh. M.

148. The radios that Maverick guards carried could not contact the Chicago Police Department. Exh. J. at 164:1-7, 362:2-23, 363:3-15, 370:10-24, 372:1-17. Maverick guards had to use a telephone to call 911 for police assistance. Exh. J at 164:8-24.

**Moore Had No Opportunity Or Reason To Intervene**

149. Horton's actions prevented Moore from calling 911. Exh. J. at 259:16-23, 260:1-3, 261:5-10, 266:1-12, 271:1-24, 272:1-2.

150. Moore could not call 911 during while the incident Horton was still occurring because the situation was too rapid and violent Exh. J. at 259:16-23, 265:16-24; weapons were drawn,

19

she could not take her eyes off of the situation because "it was just too risk[y]" Exh. J. at 261:1-3, and Horton was chasing down Moore and Walker. Exh. J. at 261:5-7.

151. Moore could not go into the building to use the telephone to call 911 because the situation was occurring and because of Horton's behavior. Exh. J at 265:21-24, 266:1-12. Horton was an aggressive attacker and she and Walker could not risk leaving the other officer or the building's residents alone with him. Exh. J at 266:5-12.

152. Moore did not believe that Walker could deal with Horton by himself if she went inside to call 911. Exh. J. at 268:23-24, 269:1-4.)

153. Moore believed she and Walker had to stay together to control the situation because they were being attacked. Exh. J. at 266:1-12, 269:5-17.

154. Moore believes that Horton had demonstrated that he could dominate her and Officer Walker. Exh. J. at 266:1-12, 269:5-17.)

155. The entire time Moore, Walker, and Horton were circling the parking lot Horton was chasing them; it was never Walker or Moore chasing Horton. Exh. J at 268:5-14; Exh. M.

156. Moore pleaded with Horton to stand down. Exh. J at 272:7-23, 273:1-2.

157. Moore drew her weapon because was in fear of her life. Exh. J at 275:14-16, 283:20-22, 284:4-20, 285:16-23.

158. Moore felt like she was under attack when Horton was backing her down; Horton wasn't playing. Exh. J at 274:17-20.

159. Horton's lack of fear was not normal. Exh. J at 305:19-20.)

160. Moore believes Horton would have seriously hurt Officer Walker if Walker had not shot Horton. Exh. J at 305:1-12.

161. Moore was in the parking lot when the shooting occurred. Exh. J at 301:12-14; Exh. M.

162.   Moore could not use her cell phone because "If I would have reached for my phone I would have had to look down at my screen, unlock it, find icons . . . it's too many steps to be like this.  My eyes would have been fixed on the phone." Exh. J. at 265:1-5.)

163.   Moore did not know that the shooting was going to occur. Exh. J at 303:23-24, 304:1-2.

164.   Moore and Walker did not have any conversations or communications while Moore, Walker, and Horton were circling the parking lot. Exh. J at 273:24, 274:1-9.

165.   Moore was in fear for her life from the time Horton first closed in on her, before Horton ripped Moore's hair out by the roots, through the balance of the encounter with Horton. Exh. J at 283:20-24, 284:4-20.


Respectfully submitted,

s/  Caroline Fronczak
Caroline Fronczak
Chief Assistant Corporation Counsel
Attorney for Defendant Walker
City of Chicago, Department of Law
Federal Civil Rights Litigation
30 N. LaSalle, Suite 900
Chicago, IL 60602
(312)744-5126 tel
(312)744-6566 fax
caroline.fronczak@cityofchicago.org


s/  Kelly C. Bauer
Kelly C. Bauer
Assistant Corporation Counsel
Attorney for City of Chicago
City of Chicago Department of Law
Federal Civil Rights Litigation Division
30 N. LaSalle St., Suite 900
Chicago, IL 60602
(312) 742-9586
(312) 744-6566 (FAX
Kelly.bauer@cityofchicago.org

s/  Michael Sanders
Attorney for Defendant Maverick Security,
Inc. and Shaquila Moore
Purcell & Wardrope, CHTD
10 South LaSalle Street, Suite 1200
Chicago, IL 60603
(312) 427-3900
MSanders@pw-law.com