**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JARROD HORTON, as Independent Administrator of the Estate of MARLON HORTON, Deceased, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 13-cv-6865 |
| v. | ) ) | Judge Robert M. Dow, Jr. |
| The CITY OF CHICAGO, a municipal corporation, CHICAGO POLICE OFFICER KENNETH F. WALKER, Star No. 9191, SHAQUILA R. MOORE, The CHICAGO HOUSING AUTHORITY, H.J. RUSSELL & COMPANY, and MAVERICK SECURITY, INC., | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court are: (1) Defendants the City of Chicago and Officer Kenneth Walker's motion for summary judgment [318] and (2) Defendants Shaquila Moore and Maverick Security Inc.'s motion for summary judgment [322]. For the reasons explained below, both motions, [318] and [322], are granted in part and denied in part. Summary judgment is granted in favor of Defendant Walker on Plaintiff's excessive force claim; in favor of Defendant Moore on Plaintiff's failure to intervene, wrongful death, and battery claims; and in favor of Defendant Maverick on Plaintiff's negligent supervision claim. Summary judgment is denied as to Plaintiff's state law wrongful death and battery claims against Defendant Walker; Plaintiff's indemnification and *respondeat superior* claims against the City; and Plaintiff's r*espondeat superior* claim against Maverick. This case is set for status hearing on October 16, 2018 at 9:30 a.m. In view of the stipulation and agreed order of dismissal as to certain claims and parties [396] entered on

September 28, 2018, Defendant Maverick Security, Inc.'s motion for summary judgment on Counts III through V of Defendant H.J. Russell's crossclaims [393] remains pending as to the express and implied indemnification only.

## I.    Background

The Court takes the relevant facts primarily from the parties' Local Rule 56.1 statements, [320], [328] through [330], [359], [366], and the exhibits attached thereto. The following facts are undisputed except where a dispute is noted. This court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343 and 1367. Venue is proper under 28 U.S.C. § 1391(b).

This action arises out of the fatal shooting of Jarrod Horton ("Horton") on the morning of September 7, 2013 at a CHA property located at 1815 W. Monroe in Chicago, Illinois (the "Property"). Defendant the Chicago Housing Authority ("CHA") contracted with Defendant H.J. Russell & Company ("Russell") to manage the Property. Russell subcontracted with Defendant Maverick Security, Inc. ("Maverick") to provide security services at the Property.[1]

Two Maverick security guards were on duty at the time of the shooting: Defendant Kenneth Walker ("Walker") and Defendant Shaquila Moore ("Moore").[2]    At the time of the incident,

---

[1]    Dr. Bobby Morris is the sole owner of Maverick Security. Dr. Morris is not aware of any incident, other than the one with Horton, where a security officer's verbal commands did not control the incident.

[2]    Maverick conducted a criminal background check and a drug test on Moore before employing her. Moore was a licensed security guard and held a firearms permit when Maverick hired her. Moore had worked as a security guard for a private security company, K-9 Security, prior to working for Maverick. Moore had not been the subject of any disciplinary actions with any of her employers prior to Maverick. Moore was never the subject of any disciplinary actions while at Maverick. In the training for her license and firearms permit, Moore received training regarding the general duties of a security guard, takedown moves, firearms training, handling criminal activity, and use of force. Prior to the incident with Horton, Moore had never used physical force with anyone and had never fired her weapon or taken her weapon from its holster while working with Maverick. Maverick's job description for its security officers was consistent with the training Moore received to obtain her security guard license, which was to observe and report, look for loitering, trespassing, criminal activity, and provide for the residents' safety. Moore did not have the power to arrest persons. She was trained by Maverick to call 911 for medical and police assistance. The radios that Maverick guards carried could not contact the Chicago Police Department. Maverick guards had to use a telephone to call 911 for police assistance.

Walker was also employed as a police officer by the Chicago Police Department ("CPD").[3] The Property is located in the district where Walker worked as a CPD officer. Walker finished his shift with the CPD at 11:00 p.m. on September 6, 2013 and began his shift at the Property at midnight on September 7, 2013. As Maverick employees, Walker and Moore were expected to follow certain company rules regarding uniforms and equipment. Maverick required its security guards to carry a weapon, wear a black company sweatshirt, and carry handcuffs. At the time of the incident, Moore was wearing her Maverick-issued black uniform shirt that said "Maverick Security." Walker's clothing did not identify him as a security officer and had no visible CPD insignia. Maverick instructed its security officers to call CPD if needed to deal with issues beyond their ability to handle. Walker had previously dealt with loitering on the property and on one prior accession had called CPD when "there were 'too many guys' loitering." [366] at 4.

Surveillance cameras on the Property captured some, but not all, of the interactions between Horton, Walker, and Moore on the morning of September 7, 2013. In particular, Defendants have produced videos from cameras located (1) on the exterior southeast corner of the 1815 West Monroe, (2) on the exterior northeast corner of the building, and (3) inside the vestibule of the front lobby pointed out towards the front entrance and parking lot. These videos show

---

[3]     Officer Walker has been a Chicago Police Officer since 1997. Prior to becoming a police officer, Walker was a corrections officer with the Cook County Sheriff's Department, where he carried a weapon but never fired or drew his weapon. Walker had been working at Maverick for three or four years before the incident with Horton. Walker had never been subject to any disciplinary actions by the Cook County Sheriff's department, CPD, or Maverick. Walker graduated from the Chicago Police Academy, where he received training on the use of force and weapons. Walker also received training from the Cook County Sheriff's department on law enforcement techniques, weapons, and the use of force. Other than the incident with Horton, Walker had never used physical force with anyone during his employment with Maverick and never had fired or displayed his weapon. Walker had fired his weapon only one other time as a Chicago Police Officer, which was 10 years ago in a carjacking incident. Walker has never been arrested or charged with a crime.

interactions between Horton, Walker, and Moore before and after the shooting, but do not show the exact moment when the shooting itself occurred.

Former CHA security analyst Brian Frost has submitted a declaration stating that on September 7, 2013, he reviewed archived video from the surveillance cameras at the Property, downloaded relevant video to his hard drive, and saved the video to discs which he provided to CPD. Frost explains how the cameras worked. According to Frost, the cameras had motion-activated systems for archiving video footage. When a camera sensed sufficient motion, it archived several seconds prior and many seconds after the motion stopped. The cameras were always recording, but if there was not sufficient motion to trigger archiving to the hard drive, the recording would be permanently erased after a few seconds. Archived recordings from the surveillance cameras contain a timestamp on the bottom, but the timestamp may not be accurate. The cameras do not record audio. According to Frost, the exterior cameras at the property were sensitive to low light conditions and may have been triggered to archive when there was no activity in the frame due to the camera recording in black and white and perceiving the blurriness of the low light conditions as motion.[4]

Video from the interior lobby surveillance camera (Exhibit M) captured much of the interaction between Horton, Walker and Moore prior to the shooting, beginning at approximately

---

[4]       Plaintiff objects to Frost offering opinions about the operation of the Property's surveillance camera system and moves to strike paragraphs of Defendants' Rule 56.1 statement that rely on Frost. However, Plaintiff has not filed a formal motion to exclude Frost's testimony under *Daubert*. See [359] at 11. Plaintiff argues that Frost is not qualified to offer such opinions because he was hired by the CHA out of college after he obtained a bachelor's degree in political science and urban planning, he has no certifications or training in video surveillance beyond on-the-job training provided by CHA Director of Security Strategies Anthony Powell, and he now works in commercial real estate. The Court will not strike Frost's testimony. Plaintiff acknowledges that Frost obtained on-the-job training on how to use the surveillance camera system. Plaintiff does not identify anything about that training or the nature of the job that requires specialized knowledge or that renders Frost unqualified to discuss how the cameras at the Property worked. To extent that the issue comes up at trial, Plaintiff is free to file a *Daubert* motion at that time.

6:31 a.m.  In the video, Horton is the male individual wearing a white sleeveless shirt over a green short-sleeved shirt and white pants; Walker is the male individual wearing a white tee shirt and dark pants; and Moore is the female individual wearing a black hooded sweatshirt and black pants.

Archived video from the northeast corner camera (Exhibit N) shows that the camera was positioned facing westbound, recording along the north side of the building, until a timestamp of approximately 6:39 a.m.  At a timestamp of approximately 6:39 a.m., the camera mounted on the northeast corner of the building was manually panned to face southbound, recording along the east side of the building.  The video shows Horton and Moore after the shooting had taken place, as well as police and fire response; it does not show Horton, Walker, or Moore prior to the shooting.

There is also archived video from the southeast corner surveillance camera (Exhibit O) for the evening of September 6 and morning of September 7, 2013.  The video shows the camera facing north, recording the east side of the building at approximately timestamp 6:12 a.m., after which there is a gap in the video until approximately timestamp 6:40 a.m.  According to Frost, the arrival of emergency vehicles at approximately 6:40 a.m. on the timestamp triggered archiving of video on the southeast corner camera, but the presence of people in front of the building was insufficient to trigger archiving.  The video also shows Moore, Walker, and Horton for brief periods in the hours before the incident, coming and going from the building.

Plaintiff denies that the videos produced in discovery and attached as exhibits to Defendants' motions for summary judgment are in fact the original, authentic, unaltered surveillance camera video recordings that were recorded to the on-site hard drive or that Frost reviewed and downloaded.  Instead, Plaintiff contends that footage from the two outside cameras "was tampered with after the shooting removing the exact time period when Walker shot Horton," and asserts that he will be "seeking an adverse spoliation inference at trial that if the video existed

it would show that Horton did not lunge for Walker's gun." [350] at 20. Plaintiff provides at least four reasons for questioning the authenticity of the videos. First, Plaintiff contends that the videos at issue contain "bookmarks" with comments, and therefore clearly are not copies of the original videos recorded by the surveillance camera. The vestibule video, for example, is bookmarked when both Walker and Horton arrive at the building, and at the time of the shooting, with Office of Emergency Management and Communication ("OEMC") event numbers and CPD Records Division numbers. Plaintiff argues that Defendants cannot explain who placed these bookmarks on the video recordings, why they did so, or when this occurred. According to Plaintiff, Frost speculated that an OEMC employee entered these bookmarks, but then testified that OEMC only had the ability to access live feeds of CHA surveillance cameras and does not have the ability to retrieve or save videos.

Second, Plaintiff asserts that the videos from the southeast and northeast cameras have gaps that suggest they have been altered in some way. The northeast corner surveillance camera video recording has a gap around the time of the shooting from 6:30 a.m. to 6:38 a.m. The southeast corner surveillance camera video recording has a 28-minute gap that coincides with the time of the incident. The southeast camera recorded hours of footage from approximately 11:50 p.m. the night before until 6:12 a.m. on the day of the shooting without any gaps or skips (except for one gap from 6:06 a.m. to 6:12 a.m.). The camera briefly reactivated at 6:12 a.m., and then the recording jumped to 6:40 a.m., when it shows Horton laying on the ground after the shooting had occurred. According to Plaintiff, CHA has not been able to provide a credible explanation for the missing footage from this camera. Plaintiff disputes Defendants' assertion that there was no motion sufficient to trigger archiving during the 28-minute gap in the video from the southeast corner surveillance camera and points out that the recording from 11:50 pm on September 6, 2013 through

approximately 6:54 am on September 7, 2013 continuously depicted hours of footage with considerably less motion than what was known to be visible and occurred during the altercation and shooting between 6:12 to 6:40 a.m. Plaintiff points out that CHA Director of Security Strategies Anthony Powell had no explanation for the 28-minute gap in the southeast camera video; Powell testified that he had seen videos skip before but not over a fatal shooting. [359-2] at 29. Powell testified that this did not seem unusual or important to him because they had other views of the incident. *Id*. CHA Deputy Chief IT Officer Bryan Land testified that the 28-minute gap in the southeast camera video is abnormal, and that he has never seen a gap that large in a CHA surveillance video. [359-3] at 25. By contrast, Frost testified that he has seen "thousands" of CHA surveillance videos with gaps longer than 20 minutes. [359-1] at 41.

Third, Plaintiff argues that documentation from SharePoint, a tool utilized by CHA security personnel to document requests for surveillance camera video, indicates that Frost located and viewed video "[f]ootage that clearly shows [the] incident." [351-4] at 3. Plaintiff contends that the SharePoint documentation suggests that, at one point, a video clearly showing the shooting existed. Fourth, Plaintiff disputes Defendants' assertion that OEMC and CPD employees do not have the ability to alter, or delete video recorded by any cameras at the property, based on Land's testimony that if a Genetec video is saved in a universal format, the video can be modified in some ways. See [359-3] at 25-26.

With Plaintiff's objections to the videos in mind, the Court turns back to the specific facts of September 7, 2013. At approximately 6:30 a.m., Moore observed Horton asleep in the vestibule of the building. It was daylight. Moore awakened Horton, identified herself as building security, and told Horton that he could not sleep there and had to leave. Walker also entered the vestibule and conveyed the same message. Horton was "generally compliant" at this point. [366] at 4.

Horton was not hostile and there was no physical contact between Horton, Moore and Walker in the vestibule. The video of the vestibule shows Horton exiting the building in a calm manner, without being forced out the door or escorted by anyone. Walker testified that at this time, he was not concerned the Horton was going to hurt anyone.

As soon as Horton walked out of the building, he urinated on the sidewalk next to Walker's vehicle. Defendants assert that Horton also cursed.[5] Walker and Moore went outside. Moore

---

[5]     Plaintiff moves to strike as hearsay this and any other statements, including threats, that Horton allegedly made during the incident. The Court will not strike such statements. When statements allegedly made during a confrontation—such as "Don't make me do this to you," "you're a dead man," "you're going to die"—are offered to show that the statements were made and heard, "[e]vidence offered for these purposes is not hearsay." *Martinez v. McCaughtry*, 951 F.2d 130, 133 (7th Cir. 1991). In other words, "[a] witness's statement is not hearsay if the witness is reporting what he heard someone else tell him for the purpose of explaining what the witness was thinking, at the time or what motivated him to do something," because "[i]n those circumstances, the out-of-court statement is not being offered as evidence that its contents are true." *United States v. Leonard-Allen*, 739 F.3d 948, 954 (7th Cir. 2013). Here, Horton's statements are being offered to establish Horton's state of mind as well as the effect on Moore and Walker and, in particular to show that Horton posed a credible threat of serious bodily injury to Moore and Walker.

    Plaintiff also moves to strike "all allegations as to alleged statements" made by Horton pursuant to Illinois' Deadman's Act, 735 ILCS 5/8-201, which Plaintiff contends "is applicable to this case based on Plaintiff's state law wrongful death claim." [351] at 23. The Court denies Plaintiff's request. As an initial matter, Plaintiff has waived the argument by failing to support it with any discussion of the applicable statute and case law. See *Gentleman v. Massachusetts Higher Ed. Assistance Corp.*, 272 F. Supp. 3d 1054, 1070 (N.D. Ill. 2017) ("It is well-settled that undeveloped and perfunctory arguments are forfeited." (citing *M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017)). Plaintiff's argument also fails on the merits. The Dead Man's Act does not apply to federal claims or where the testimony sought to be excluded relates to overlapping state and federal claims. See *Estate of Chlopek by Fahrforth v. Jarmusz*, 877 F. Supp. 1189, 1193 (N.D. Ill. 1995); *Donohoe v. Consolidated Operating & Production Corp.*, 736 F. Supp. 845, 860–61 (N.D. Ill. 1990), *aff'd in part and vacated in part on other grounds*, 736 F. Supp. 845 (7th Cir. 1990). The federal and state claims in this case are overlapping because they involve a single event: the fatal shooting of Mr. Horton. Further, the Dead Man's Act applies only to the testimony of interested witnesses—here, Walker and Moore—and would not apply to the testimony of others witnesses, such as Ms. Stange. See *Zang v. Alliance Financial Services of Illinois, Ltd.*, 875 F. Supp. 2d 865, 881 (N.D. Ill. 2012). Finally, Plaintiff's perfunctory argument does not address any of the exceptions to the Dead Man's Act. Most relevant here, "[i]f any person testifies on behalf of the [deceased person's] representative to any conversation with the deceased *** or to any event which took place in the presence of the deceased ***, any adverse party or interested person, if otherwise competent, may testify concerning the same conversation or event." 735 ILCS 5/8-201. Thus, to the extent that Plaintiff intends to call at trial any witnesses to the shooting—and it is difficult to see how Plaintiff could prove his case without any such witnesses—he will waive his right to rely on the Dead Man's Act. Indeed, Plaintiff resists summary judgment by relying extensively on the testimony of witnesses to the shooting, including Walker and Moore. See generally [351].

went first, carrying a cup of coffee. Walker joined her. Horton pulled on the doors of a parked car that belonged to Walker. Moore testified that while Horton was pulling the door handles, Horton was not acting in a threatening manner. Moore testified that Horton said, "This is my people's shit." [320-10] at 60. Walker and Moore calmly stood by and continued to ask Horton to leave the property. Walker testified that Horton responded, "Make me leave," "Make me, I'll kick both of y'all asses. You ain't got shit." [320-9] at 39. Moore testified that she said to Walker, "[m]aybe we got to detain him." [320-10] at 56. Walker testified that he told Horton, "Hey, we're going to lock you up if you continue on this road." [320-9] at 35. Walker testified that Horton said "I don't give a fuck" and "You is the bitch-ass police. You ain't going to do shit." *Id.* at 26. Walker presented his police badge, announced he was a police officer, and told Horton that he was under arrest. Walker testified that his impression prior to attempting to detain Horton was that Horton appeared to be drunk and was stumbling all over the place.

Walker testified that Horton turned toward Walker and said "Lock me up motherfucker. Try. Bring it on." [320-9] at 38. Walker and Moore testified that after Plaintiff was told he was under arrest, Horton responded, "Come get me, then" "You ain't going to do shit" "I will fuck you up" and "I'll knock your ass out" as he stepped toward Walker. [320-10] at 55. Moore testified that Horton turned and started walking toward Moore threatening "Bitch I'll knock you out." [320-10] at 66. Moore backed away from Horton. Walker then kicked the lower part of Horton's leg, causing Horton to stumble slightly. This was the first physical contact between Horton and either security officer. It is disputed whether Horton was moving toward or "rushing" Moore at the time of the kick and whether Horton was being overtly aggressive or threatening. The video from the vestibule does not show what happened because the kick was obscured by a pillar.

Defendants, citing Moore and Walker's testimony and the video from the vestibule,

contend that Horton grabbed and twisted Walker's leg, knocking Walker to the ground, and then began punching Walker while he was on the ground. The video from the vestibule does not show this alleged altercation, because a pillar blocks the view. Moore swung at Horton. Defendants contend that Moore was trying to pull Horton off of Walker, but Plaintiff disputes this and the video does not show what Moore was doing. The video does show, however, that Horton grabbed Moore's braids and ripped her natural hair out by the roots. The video further shows that, after her hair was pulled out, Moore pulled her firearm out of its holster and pointed it at Horton to protect herself, backing into the parking lot as Horton walked toward her. Walker also drew his weapon and pointed it at Horton. Walker admitted, however, that during the scuffle Horton did not try to grab Walker's weapon, which was secured in an ankle holster.

A resident of the building, Tawanda Stange, testified that she watched from her second-story window as Horton moved toward Moore. Stange testified that Moore was saying "back up, back up I don't want to have to shoot you" and Horton responded, "Bitch. Fuck you. I don't care about that gun. I'm going to beat your ass again." [320-21] at 7-9. According to Moore, Horton also said, "That gun ain't shit," and "bitch you ain't about that life" as he backed Moore down. [320-10] at 74. Stange testified that she interpreted Horton's actions in advancing on the officers as trying to take their weapons. Stange also testified that Horton was very aggressive toward the officers.

After he was knocked to the ground, Walker stood and immediately drew his weapon and pointed it at Horton. Walker testified that Horton threatened to take his and Moore's weapons, saying "That don't mean shit to me I'll take your guns and shoot you with them." [320-9] at 54. Walker testified that he approached Horton with his gun drawn and told Horton to get down on

the ground and that he was under arrest. Walker testified that Horton responded, "Fuck that" "I don't give a shit" "Come get me" "I'll kill both of y'all." *Id*.

Walker, Moore, and Horton continued moving around the parking lot. Plaintiff characterizes the movement as "the three of them circling" the parking lot, while Defendants describe it as Horton "chasing" Walker and Moore. The video shows that Horton was advancing toward Walker and Moore, while they had their weapons drawn and pointed at him. While they were moving around the parking lot, Horton pulled on his pants several times. Horton did not have a knife or gun or tell Walker that he had a weapon. Immediately after drawing his weapon, Walker did not feel the need for additional police assistance. Walker did not tell Moore to call 911, and Moore did not suggest calling for backup or using a different course of action with Horton. At one point Moore quickly reached down with one hand to pick up a clump of hair that Horton had torn out. Moore reached down a second time to pick up another clump of hair or Walker's wallet or police badge. It is disputed whether Moore ever took her eyes off of Horton.

Moore and Walker testified that while they were moving around the parking lot, Horton repeatedly threatened to take their weapons and shoot them. Stange described the encounter as "like a volley" in which Horton advanced on whichever security officer spoke to him, and the officer backed up with gun drawn. Horton advanced on Walker as he backed away with his weapon directed at Horton. Horton turned toward Moore, and she backed away out of frame of the vestibule camera. As Horton moved toward Moore, he was talking and put a closed fist into his other hand. Stange testified that she heard Horton make several threatening statements to Moore, including threatening to beat her up and take her gun. Horton followed Moore out of range of the camera.

Joe Powell looked out his fourth floor window and saw a confrontation between a man and the female security guard (Moore). Powell had seen the man asleep in the vestibule earlier. Moore had her gun drawn. Powell testified that he heard her yell that "if he came any closer," she was "gonna shoot." [320-22] at 8. According to Powell, Horton said, "I'm not afraid to die; I'm ready to die" and "just walked away towards the sidewalk" away from Moore. *Id*. Powell described Horton's demeanor during this exchange as agitated and angry, and stated that Moore appeared distressed and very upset. Powell last saw Horton walking along the sidewalk at which point Powell walked away from his window, intending to go downstairs to see if he could help. Powell therefore did not see all of the interaction between Moore and Horton. Powell put his clothes on and was at his door when he heard a gunshot.

Walker testified that Horton charged Moore and grabbed her in a bear hug, with his arms almost all the way around her. According to Walker, Horton reached for Moore's weapon. Plaintiff disputes this account, on the basis that it is not captured on video and that Moore had no memory of Horton grabbing her or trying to disarm her. See [359-5] at 67. Plaintiff also notes that in the supplemental case report documenting Walker's statement to the CPD, there is no mention of Horton grabbing Moore.[6]

According to Walker, Moore was shaking, and Horton commented "Bitch, you scared. I got your ass. And I'm gonna take this motherfucker. . ." [320-9] at 59. Anthony Whooper, who

---

[6] Defendants object to this police report as hearsay. Generally, however, "statements made in police reports are admissible under Fed. R. Evid. 803(8), which is a hearsay exception permitting the admission of public records." *Padilla v. City of Chicago*, 932 F .Supp. 2d 907, 918 (N.D. Ill. 2013); see also *Salmi v. D.T. Management, Inc.*, 2002 WL 31115581, at *3 (N.D. Ill. Sept. 23, 2002) ("the police report is not inadmissible hearsay"; "[b]ecause this is a civil—not a criminal—matter, a police officer's statements of facts and observations in his report are admissible"); Fed. R. Evid. 803(8) (hearsay exception for public record if it sets out "a matter observed while under a legal duty to report, "but not including, in a criminal case, a matter observed by law-enforcement personnel"). Defendants have not offered any evidence that the "source of information" or "other circumstances indicate a lack of trustworthiness." *Padilla*, 932 F. Supp. 2d at 918 (citing Fed. R. Evid. 803(8)).

worked at the building as a janitor, was on the other side of the building and heard Moore (who he knew as "Shaq") shouting "Get off me, it don't got to be like this." [320-20] at 10. Moore sounded scared and distressed, and Whooper had "the impression that they was tussling or he was trying to come up on her." *Id*. at 11. According to Walker, he ran over, shoved Horton with his elbow, and succeeded in getting him away from Moore. When Horton and Moore were struggling, Walker did not shoot Horton because Moore was in his line of fire. Moore has no memory of Horton grabbing for her gun, but remembers that Walker did something to get Horton's attention away from her and stop him from rushing at her. Walker testified that he pushed Horton, and Horton started coming after Walker. Plaintiff disputes this account on the basis that Moore testified that she had no memory of Horton grabbing her and the supplemental police report does not mention a grab.

According to Moore, Horton turned to Walker and said "[w]hat you going to do, puss-ass nigger? I'll kill you," and then rushed Walker. [320-10] at 77. Walker testified that Horton pursued him around the parking lot, telling him he was going to take his weapon and kill him with it. Walker testified that Horton was at times closer than 3 to 5 feet from him as Horton pursued him around the parking lot. The video shows that as Horton was moving toward Walker, Walker was backing away. Walker testified that he pleaded with Horton "don't do this, I'm going to put you down." [320-9] at 62-63. Horton and Walker passed in front of the lobby doors as Walker was backing away from Horton. The lobby video shows them approximately one sidewalk square apart, a distance of 60 inches, or five feet. Both Walker and Horton passed through an area where the lobby video camera's view was obstructed by a central pillar between the double doors, creating a "zone of obscuration" which ranged from 52 inches (4' 4") wide adjacent to the building to 76 inches (6' 4") wide at the curb. Defendants' forensics expert, Lucient Haag, submitted a

declaration estimating that Horton "was within approximately seven to eight feet of *** Walker and within approximately five to six feet of Walker's revolver when the shot was fired." [320-23] at 4. According to Walker, Horton was saying," "I'm going to take that weapon," "I'm going to take that weapon and shove it up your ass," "I'm going to take that weapon and shoot you with your own goddamn weapon." [320-9] at 71. Walker testified that he believed Horton was serious about his threats. Plaintiff disputes this, pointing to evidence that Walker never called for police backup or instructed Moore to do so.

According to Walker, Horton was three to five feet from him when Horton reached for Walker's weapon. According to Walker, Horton's hand was extremely close to his weapon, maybe a foot away. Plaintiff disputes Walker's testimony on the basis that the video does not show that Horton reached for Walker's weapon. Plaintiff also points out that Stange, who claims to have heard the encounter from her window above the scene, acknowledged that she did not see Horton try to grab Walker's weapon.

Walker hopped back as he raised his weapon and fired a single shot, which struck Horton in the chest. Horton was seven to eight feet away from Walker and five to six feet away from the weapon in Walker's outstretched arm at the time of the shooting. When Walker hopped back immediately prior to firing, he increased the distance between himself and Horton by approximately two feet. Horton fell to the ground. It is disputed which direction he fell. Plaintiff submits that Horton fell backwards, while Defendants assert that Horton turned and fell on his side. The video is partially obscured, but it appears that Horton's momentum was backward and he fell on his side; he did not fall forward toward Walker.

According to Haag's declaration, Horton's stride was approximately 30 inches long and he could advance seven feet in three quick steps, which could take one second.[7] Dr. Haag opines that a person of Horton's size can reach with an outstretched arm and hand and shorten the separation distance by nearly three feet. Because of the firing mechanism on Walker's revolver, if Horton had grabbed Walker's revolver, his grasp on the revolver could have rendered the revolver temporarily incapable of firing. If wrested away from Walker, the revolver would have been fully capable of firing.

In the moments just before Walker shot Horton, Moore screamed out "No, no, Oh, my God, oh, my God" in reference to what she understood to be the "climax that was about to occur." [359-5] at 79. Stange did not see the shooting because at the time it occurred, she had stepped away from the window to call 911. Stange had just finished calling 911 and was in the living room when she heard the shot. She went downstairs to see who had been shot.

After the shooting, the video shows Horton rolling on the ground, still alive. Neither Moore nor Walker pat Horton down for weapons. The video shows Walker enter the building immediately after the shooting, while Moore remained outside. Moore immediately used her phone to dial 911. The video shows that she paced around during the phone call, at times facing away from Horton. Moore testified that Horton's actions prevented her from calling 911 before the shooting, because she could not take her eyes off the situation or leave Moore by himself. Plaintiff disputes this and argues that the video from the vestibule shows that Moore could have called the police when she was in the building, or at any time before Walker kicked Horton, or

---

[7]  Plaintiff disputes this opinion on the basis that Horton was intoxicated and stumbling at the time of the encounter, and Dr. Haag's affidavit does not indicate that he took this factor into account. However, the video shows that Horton was able to walk, so Dr. Haag's decision not to factor this is does not render his opinion incompetent.

after the kick instead of picking up her hair. Moore testified that she believes that Horton had demonstrated that he could dominate her and Walker.

Horton died from his injuries. Plaintiff, who is Horton's surviving brother, brought this lawsuit as Independent Administrator of Horton's estate. Plaintiff's governing Fourth Amended Complaint [128] contains the following claims: a Section 1983 claim against Walker for excessive force (Count I); a Section 1983 claim against Moore for failure to intervene (Count II); a Section 1983 claim against Walker and Moore for failure to provide medical care (Count III); a Section 1983 claim against Walker and Moore for conspiracy (Count IV); state law claims for intentional infliction of emotion distress ("IIED") (Count V), wrongful death under Illinois' Wrongful Death Act, 740 ILCS 180/0.01 et seq. (Count VI), and battery (Count VII), which are based on the alleged actions of Walker and Moore and pray for relief against "Defendants" generally; a claim against H.J. Russell and Maverick for negligent supervision (Count VIII); a Monell claim against the City based on its alleged failure to adequately investigate and discipline its officers who have been involved in shootings of civilians (Count IX); a Monell claim against CHA based on its alleged failure to adequately investigate, train, monitor, and discipline security guards, security guard companies, and property management companies who provide services at CHA properties (Count X); a claim against the City and CHA for indemnification (Count XI); and a *respondeat superior* claim against the City, CHA, H.J. Russell, and Maverick for the torts committed by their alleged agents, Walker and Moore (Count XII). In its September 15, 2016 order [268], the Court dismissed Counts V and VII without prejudice as to Maverick only.

On December 14, 2017, Plaintiff filed stipulations, [316] and [317], to voluntarily dismiss with prejudice Count III (failure to provide medical care), Count IV (conspiracy), and Count V (intentional infliction of emotional distress) against the City, Maverick, Walker, and Moore. On

September 28, 2018, the Court entered a stipulation and agreed order of dismissal [396] approving a settlement between Plaintiff, CHA, and Russell.  As a result of the settlement, CHA is dismissed from the case; Russell remains in the case as a cross-claimant.

Currently before the Court are the City and Walker's motion for summary judgment [318] and Moore and Maverick's motion for summary judgment [322] on all claims against them that remain.

## II.     Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by *** citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact.  See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party."  *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532-33 (7th Cir. 2013) (citation omitted).

To avoid summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial."  *Liberty Lobby*, 477 U.S. at 250.  Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Ellis v. CCA of Tennessee LLC,* 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex,* 477 U.S. at 322). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

## III.  Analysis

### A.  The City and Walker's Motion for Summary Judgment [318]

#### 1.  Section 1983 Excessive Force Claim Against Walker

In Count I of the governing Fourth Amended Complaint, Plaintiff alleges that Walker subjected Horton to excessive force in violation of the Fourth Amendment to the United States Constitution by "fatally shooting him." [128] at 3. "The Fourth Amendment is implicated because a police officer's use of deadly force constitutes a seizure within the meaning of that amendment and therefore is constitutional only if it is reasonable." *DeLuna v. City of Rockford*, 447 F.3d 1008, 1010 (7th Cir. 2006). "[A] person has a right not to be seized through the use of deadly force unless he puts another person (including a police officer) in imminent danger or he is actively resisting arrest and the circumstances warrant that degree of force." *Weinmann v. McClone*, 787 F.3d 444, 448 (7th Cir. 2015); see also *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988) ("it is reasonable to use deadly force if the officer, when exercising his or her reason and judgment, has probable cause to believe that the suspect poses a threat of death or serious physical harm to the officer or others and, whenever possible, warns the suspect before firing").

Walker argues that even if his use of deadly force on Horton violated the Fourth Amendment, Walker is nonetheless shielded from suit by the doctrine of qualified immunity. "The

qualified immunity doctrine provides defendants immunity from suit, not just a defense to liability." *Sebesta v. Davis*, 878 F.3d 226, 233 (7th Cir. 2017) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "Though it is an affirmative defense for pleading purposes, the plaintiff carries the burden of showing that defendants are not immune." *Id.* Walker has asserted qualified immunity, and therefore Plaintiff can proceed with his claim only if he can show both that (1) "the 'facts, taken in the light most favorable to [him], make out a violation of a constitutional right,'" and (2) the right was 'clearly established at the time of the alleged violation.'" *Hurt v. Wise*, 880 F.3d 831, 840-41 (7th Cir. 2018) (quoting *Allin v. City of Springfield*, 845 F.3d 858, 862 (7th Cir. 2017)). The Court "may address these issues in whatever order seems best for the case at hand." *Sebesta*, 878 F.3d at 233. In this case, the Court begins with the second requirement because it is dispositive.[8]

---

[8]     As to the first factor, Supreme Court "case law sets forth a settled and exclusive framework for analyzing whether the force used in making a seizure complies with the Fourth Amendment." *County of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546 (U.S. 2017) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 496 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). In considering whether a particular use of force is unconstitutional, the Court is required to "consider the facts and circumstances of each particular case," rather than some generalized or archetypical version of that kind of use of force. *Weinmann v. McClone*, 787 F.3d 444, 448 (7th Cir. 2015). Factors that may be relevant in a particular case include "the severity of the crime; whether the suspect posed an immediate threat to the officers or others; whether the suspect was resisting or evading arrest; whether the individual was under arrest or suspected of committing a crime; whether the individual was armed; and whether the person was interfering or attempting to interfere with the officer's duties." *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015) (citing *Padula v. Leimbach,* 656 F.3d 595, 602 (7th Cir. 2011)). The reasonableness of a use of force is "analyzed from the perspective of a reasonable officer under the circumstances, rather than examining the officer's actions in hindsight." *Dawson*, 803 F.3d at 833. "[I]f there are sufficient undisputed material facts to establish that the officer acted reasonably under the circumstances, then the court must resolve the issue as a matter of law, rather than allow a jury to 'second-guess' the officer's actions." *Dawson*, 803 F.3d at 833. That said, the "reasonableness inquiry 'nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom,'" and therefore the Seventh Circuit has "'held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly.'" *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)).

In order to satisfy the second requirement, Plaintiff "bears the burden of showing that there is a case 'on point or closely analogous' that allows us to conclude that a reasonable government employee would or should know that [Walker's] conduct [wa]s unlawful." *Sebesta*, 878 F.3d at 234 (quoting *Boyd v. Owen*, 481 F.3d 520, 527 (7th Cir. 2007)). "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, -- U.S. --, 137 S. Ct. 548, 551 (2017) (internal quotation marks and citation omitted). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen,* 543 U.S. 194, 198 (2004). Although there need not be "'a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.'" *Kisela v. Hughes*, -- U.S. --, 138 S. Ct. 1148, 1152 (2018) (quoting *White*, 137 S. Ct. at 551). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *White*, 137 S. Ct. at 551.

The Supreme Court has "repeatedly told courts *** not to define clearly established law at a high level of generality." *Kisela*, 138 S. Ct. at 1152. "[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix v. Luna,* 136 S. Ct. 305, 308 (U.S. 2015) "Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela*, 138 S. Ct. at 1153. "Precedent involving similar facts

can help move a case beyond the otherwise 'hazy border between excessive and acceptable force' and thereby provide an officer notice that a specific use of force is unlawful." *Id.*

Plaintiff argues that Walker is not entitled to qualified immunity because *Tennessee v. Garner*, 471 U.S. 1 (1985), "established more than 30 years ago that it is a Fourth Amendment violation to use deadly force against an unarmed and non-dangerous individual." [350] at 30. *Garner* did establish that "[a] police officer may not seize an unarmed, nondangerous suspect"— in that case, a felony suspect fleeing arrest—"by shooting him dead," and therefore a Tennessee statute was "unconstitutional insofar as it authorizes the use of deadly force against such fleeing suspects." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). But *Garner* is not enough to defeat a claim of qualified immunity. As the Supreme Court has recently reiterated, "the general rules set forth in "*Garner* and *Graham* [*v. Connor*, 490 U.S. 386 (1989)] do not by themselves create clearly established law outside an 'obvious case.'" *White*, 137 S. Ct. at 552 (quoting *Brosseau*, 543 U.S. at 199.

This is not such an "obvious case." *White*, 137 S. Ct. at 552 Considering the evidence in the light most favorable to Plaintiff, Horton pursued Moore and Walker at close distance, while they had their guns drawn and were telling him to stand back. Regardless of whether Horton had a weapon, was threatening to take Walker's weapon, or lunged at Walker immediately before the shot was fired,[9] Horton's close proximity to Walker's weapon and unwillingness to stand down distinguish this case from *Garner*, which involved a fleeing suspect. The undisputed evidence also shows that, in the moments leading up to the shooting, Walker and Horton engaged in some sort of struggle that led to the two men falling to the ground and that when Moore intervened,

---

[9] The Court assumes for purposes of this motion that Horton did not lunge toward Walker in the moments before he was shot. It is therefore unnecessary for the Court to resolve whether Plaintiff would be entitled at trial to "seek[] an adverse spoliation inference" that allegedly missing footage from the two outside cameras "would show that Horton did not lunge for Walker's gun." [350] at 20.

Horton violently ripped out Moore's braided hair at the roots. The undisputed evidence also supports Defendants' account that Horton was threatening Moore and Walker before he was shot. It is not necessary for the Court to consider Moore's and Walker's testimony to reach this conclusion, because Stange, a third-party witness, provided a consistent account. Plaintiff has not controverted Stange's testimony that she heard Horton make several threatening statements to Moore, including that he would beat her up and take her gun. Plaintiff argues that it is disputed whether Horton tried to disarm Moore. He offers a small amount of circumstantial evidence to support his position: this is not in the police report; Moore could not remember if Horton tried to take her gun. But even if Horton did not try to disarm Moore, all the evidence in the record indicates that Horton was advancing aggressively toward Moore when Walker intervened, at which point Horton turned back on Walker.

Plaintiff has not identified any "existing precedent" that "squarely governs the specific facts at issue" here. *Kisela*, 138 S. Ct. at 1148. In contrast, Walker identifies several cases in which the Seventh Circuit upheld summary judgment rulings that the use of deadly force was justified where the decedent was advancing on the officer. In *DeLuna v. City of Rockford*, 447 F.3d 1008 (7th Cir. 2006), the Seventh Circuit affirmed the district court's grant of summary judgment to the defendant officer on the ground that his use of deadly force was reasonable, where the officer was responding to a domestic violence call involving a decedent with a known history of violence, the decedent told the officer that the officer would have to kill him, and when the officer told the decedent to stop advancing toward him, the decedent kept advancing and lunged at the officer when he stumbled, at which point the officer fired one shot. *Id.* at 1012. The undisputed hypothetical used by defendant's expert in *DeLuna* assumed that the police officer and the decedent "were anywhere from 5–15 feet apart when" the officer shot the decedent. *Id.* The

court explained that "[r]egardless of whether [the officer] saw a gun or believed [the decedent] was reaching for [the officer's] weapon, the action of [the decedent] lunging towards him after the threats and bizarre conduct, established the real danger of imminent serious bodily injury." *Id*. at 1013. According to the court, the officer was not required to "wait until there is a physical struggle for control of his weapon before a situation presents an imminent danger of serious physical injury." *Id*. Similarly, in *Tom v. Voida*, 963 F.2d 952 (7th Cir. 1992), the court of appeals affirmed a grant of summary judgment for a police officer on an excessive force claim arising out of a fatal shooting where the officer justifiably believed that the suspect posed an immediate threat to her after he had already physically beaten her and was rushing at her again.

Perhaps the threats posed by the decedents in *DeLuna* and *Tom* were clearer—Horton walked quickly toward Walker but arguably was not "rushing" him; Plaintiff disputes Walker's account that Horton was reaching for Walker's weapon, and the video does not show the exact moment when the shot was fired. Nonetheless, when the undisputed facts are viewed in the light most favorable to Plaintiff, there is not a wide gulf between the facts of *DeLuna* and this case. The video clearly shows that Horton was walking quickly toward Walker and was within eight feet of Walker and his firearm when he was shot. And there is plenty of evidence that Horton presented a risk to the officers' safety. He had a physical scuffle with Walker; he pulled out Moore's hair; and he continued to advance toward the officers repeatedly despite their drawn firearms. Plaintiff has not identified—and the Court has not found—any controlling case law with even remotely similar facts in which a defendant was found to have used excessive force by shooting. While it is established that officers may not "use significant force on nonresisting or passively resisting suspects," *Williams v. Indiana State Police Dep't*, 797 F.3d 468, 484 (7th Cir. 2015), Horton does not fit into that category of suspects. The facts concerning Walker's conduct show, at worst, that

it lies in "the sometimes hazy border between excessive and acceptable force," for which qualified immunity provides protection. *Saucier v. Katz*, 533 U.S. 194, 206 (2009). For this reason, the Court concludes that Walker is entitled to summary judgment on the excessive force claim based on qualified immunity. It is unnecessary for purposes of deciding this claim to determine whether "the 'facts, taken in the light most favorable to [Plaintiff], make out a violation of a constitutional right.'" *Hurt*, 880 F.3d at 840-41 (quoting *Allin v*, 845 F.3d 862).

**2.    State Law Claims Against Walker**

Walker argues that he also is entitled to summary judgment on Plaintiff's state law claims for wrongful death and battery because (1) his use of force was justified under 720 ILCS 5/7-5 and (2) he is shielded from liability by Illinois' Tort Immunity Act.

720 ILCS 5/7-5 governs a peace officer's use of force in making an arrest and provides an affirmative defense to wrongful death and battery claims. See *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002); *In re T.W.*, 888 N.E.2d 148, 156 (Ill. App. 2008). The statute provides that:

> (a) A peace officer, or any person whom he has summoned or directed to assist him, need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. He is justified in the use of any force which he reasonably believes to be necessary to effect the arrest and of any force which he reasonably believes to be necessary to defend himself or another from bodily harm while making the arrest. However, he is justified in using force likely to cause death or great bodily harm only when he reasonably believes that such force is necessary to prevent death or great bodily harm to himself or such other person, or when he reasonably believes both that:
>
> (1) Such force is necessary to prevent the arrest from being defeated by resistance or escape; and
>
> (2) The person to be arrested has committed or attempted a forcible felony which involves the infliction or threatened infliction of great bodily harm or is attempting to escape by use of a deadly weapon, or otherwise indicates that he will endanger human life or inflict great bodily harm unless arrested without delay.

720 ILCS 5/7-5. Citing this statute, the Seventh Circuit has explained that "[t]he same rule applies" to wrongful death claims under Illinois law as to Fourth Amendment excessive force claims: "'when an officer believes that a suspect's actions [place] him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force.'" *Muhammed*, 316 F.3d at 683 (quoting *Sherrod*, 856 F.2d at 805); see also *Williams v. Village of Maywood*, 2016 WL 4765707, at *4 (N.D. Ill. Sept. 13, 2016) (Illinois wrongful death claim "is governed by a standard similar to the standard governing Fourth Amendment excessive force claims, meaning that the claims are likely to stand or fall together"); *Lampkins v. Jones*, 2014 WL 12621565, at *4 (N.D. Ill. Nov. 4, 2014) ("A finding that a police officer's use of deadly force was reasonable due to the imminent danger of death or serious bodily injury to himself or others has been found to foreclose actions based on both the Fourth Amendment and the Illinois Wrongful Death Act." (citing *Muhammed*, 361 F.3d at 683)).

Illinois' Tort Immunity Act protects local public employees from liability for actions "committed in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202. Willful and wanton conduct is "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety or others or their property." 745 ILCS 10/1-210. To determine if Walker's conduct could be considered "willful and wanton" under the Tort Immunity Act, the Court must determine if Walker "acted without legal justification." See *Davis,* 8 N.E.3d at 148 (holding, in wrongful death police shooting case, that trial court's modification of pattern jury instruction to incorporate the phrase "without legal justification" was proper and "harmonized plaintiff's burden of proof on her battery claim to prove the contact was unauthorized, the affirmative defense of immunity under the [Tort Immunity] Act,

and plaintiff's burden to prove willful and wanton conduct, while accounting for self-defense or legal justification as a legally authorized contact"); *Wilson v. City of Chicago*, 758 F.3d 875, 880 (7th Cir. 2014) (in wrongful death claim arising out of police shooting, plaintiff had burden to prove that police officers acted without legal justification, where officers claimed immunity under the Tort Immunity Act). This, in turn, requires an examination of whether Walker's conduct was justified under 745 ILCS 10/2-202, which applies the Fourth Amendment standard.

In sum, to decide if Walker is protected by 720 ILCS 5/7-5 or the Tort Immunity Act, the Court must answer the question left open in regard to Plaintiff's federal excessive force claim as a consequence of the qualified immunity doctrine—namely, whether, viewing the evidence in the light most favorable to Plaintiff, Walker's use of force complied with the Fourth Amendment. As determined above, it was not clearly established at the time of the shooting that Walker's alleged conduct constituted an unacceptable use of force under the Fourth Amendment. That does not mean, however, that every reasonable juror necessarily would conclude that Walker's use of force did, in fact, comply with the Fourth Amendment. See, e.g., *Ellis v. Wynalda*, 999 F.2d 243, 246 (7th Cir. 1993) ("When reasonable minds could differ [on whether a particular use of force is excessive], in the typical summary judgment decision the balance tips in favor of the nonmovant while in the qualified immunity context the balance favors the movant."). Although it is a close call, the Court cannot say as a matter of law that Plaintiff's claim is so weak that it should not go to a jury on the question of whether Walker's conduct complied with the Fourth Amendment or was justified under Illinois law. See *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (noting that the "reasonableness inquiry 'nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom,'" and therefore "'summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly'").

Instead, when the undisputed evidence is viewed in the light most favorable to Plaintiff and factual disputes are resolved in his favor, Walker's conduct falls within the "hazy border" of force that that the law has neither declared excessive nor deemed constitutional.

Most importantly, there are disputed questions of fact concerning whether Horton was actively trying to disarm Moore or Walker at the time he was shot. The videos from the Property do not capture the critical moments of the encounter. When Horton was allegedly trying to disarm Moore, Horton and Moore were to the left of the vestibule camera's range. Plaintiff maintains that Horton's "alleged off-camera attack and attempted disarming" or Moore was fabricated to justify the subsequent shooting. [350] at 11. Plaintiff identifies some circumstantial evidence to support his position: Moore does not remember Horton grabbing her or trying to take her firearm; a supplemental police report completed after the incident and memorializing Walker's statement to police does not mention Horton physically attacking Walker or attempting to disarm her; and Powell, who saw the confrontation between Moore and Horton from his fourth floor window, saw Horton walking *away* from Moore down the sidewalk.

The video from the vestibule camera also does not show the moment, immediately before Horton was shot, when Horton allegedly lunged at Walker in an attempt to disarm him. This gap is susceptible to different interpretations: maybe Horton never lunged; perhaps he lunged in the short period of time when he and Walker were behind a pillar and thus obscured from the camera's view. The dispute over whether Horton lunged distinguishes this case from *DeLuna*, discussed above, in which it was undisputed that the officer shot a decedent who "kept advancing and lunged at the officer when he stumbled," at which point the officer fired a single shot. 447 F.3d at 1012.

The video from the vestibule camera also does not show the moment when Horton was shot. Horton comes back into camera range after he is shot and is falling to the ground. According

to Plaintiff, Horton fell backwards, indicating that he was not lunging forward when he was shot. But according to Defendants, Horton turned and fell on his side, which is consistent with him lunging forward at the time of the shooting. As the Court views the video, Horton's momentum was backward and Horton he fell on his side, which could be consistent with either side's version of events. Walker and the City have submitted an affidavit from their retained expert Lucien Haag, an independent forensic consultant on the subjects of firearms identification, firearms-related evidence, and the reconstructive aspects of shooting incidents. See [320-23]. Based on his analysis of Horton's autopsy report, the relative heights of Horton and Walker, and Walker's shooting stance, Haag opines that "Horton was in a forward leaning position at the time he was shot," rather than a "leaning away or avoidance posture." *Id*. at 5. Plaintiff has not offered his own expert on this topic. However, Haag's opinion is not necessarily inconsistent with Plaintiff's position that there was no lunge. Haag stated that Horton was leaning forward, but not that he lunged. This is already apparent from the video; in the seconds before the shooting, Horton was walking toward Walker leaning at a slight forward angle.

Walker and the City also emphasize testimony that Walker, Moore, and Stange all heard Horton make verbal threats to disarm Walker and Moore and use their weapons against them. Plaintiff responds that a jury would not be required to believe this testimony. However, Plaintiff cannot avoid summary judgment by attacking a witness's credibility unless he has some independent facts to support his claims. See *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008); *Muhammed*, 316 F.3d at 683–84. Plaintiff does not identify any reason why a factfinder should doubt Stange's testimony that she heard Horton threaten to disarm Moore. Plaintiff also does not identify any specific evidence that calls into question the credibility of Moore's testimony that, when Horton turned to Walker in the final moments of the incident, Horton threatened to kill

Walker. As to Walker's testimony, Plaintiff has identified some potential impeachment evidence: Walker's alleged fabrication of Horton's attack on and attempt to disarm Moore, which Walker did not include in his statement to police.

Plaintiff contends that even if Horton did make verbal threats, the situation was not serious enough to justify the use of deadly force. According to Plaintiff, "there was no reflexive or instinctual response by Walker to a sudden and deadly act by Horton," but rather, "this was a slow developing four-minute encounter between two, armed security guards and an unarmed man who could barely stand up, and who had been cooperative until he was attacked," and the officers "had ample time to take other actions, including calling the police." [350] at 24.

The Court ultimately agrees with Plaintiff that a jury should determine whether Walker's use of force was reasonable under the circumstances. Although the undisputed facts at least place this incident within the grey area within which qualified immunity shields Walker from liability under federal law, the facts are neither uncontested nor so crystal clear that the merits can be resolved as a matter of law. As explained above, it is disputed whether Horton tried to disarm Moore before turning his attention to Walker. If a jury believed that Horton did not attempt to disarm Moore, it could conclude that a reasonable officer in Walker's position would not perceive Horton to be an imminent threat. It could also conclude that Walker's testimony was not credible, since Walker testified at his deposition (in an alleged contradiction to his statement to the police after the incident) that Horton grabbed and tried to disarm Walker. It is also disputed whether Horton was lunging at Walker immediately before Walker fired his gun. If Horton did not lunge, this gives credence to Plaintiff's position that there was no emergency precipitating the final shot, and therefore Walker's decision to fire at that moment was unreasonable. And qualified immunity from a Section 1983 claim "does not provide a shield against * * * state law claims, which perforce

look to state rules of immunity." *Robinson v. Gerritson*, 210 F. Supp. 2d 1004, 1013 (N.D. Ill. 2002). Some state immunity rules track federal law. See *Cherry v. Town of Westville*, 2017 WL 2930499, at *2 (N.D. Ind. July 10, 2017) ("The Indiana Supreme Court had held that the qualified immunity applicable to federal claims applies equally to claims against government officials under state law"). But Illinois' do not. See *Jenkins v. Spaargaren*, 2011 WL 1356757, at *6 (N.D. Ill. Apr. 7, 2011) (denying summary judgment on malicious prosecution claim and explaining "that claim is brought under Illinois law, and Defendants cite no authority holding that qualified immunity applies to supplemental state law claims"); *Roe v. Village of Westmont*, 2003 WL 444508, at *3-*4 (N.D. Ill. Feb. 24, 2003) (rejecting argument that qualified immunity for federal claims extends to state law claims). For these reasons, the Court concludes that Walker is not entitled to summary judgment on Plaintiff's wrongful death or battery claims.

### 3.     Claims Against the City

Defendants argue that the City is entitled to summary judgment on Plaintiff's indemnification and *respondeat superior* claims (Counts XI and XII) because both claims are dependent on Walker being found liable on the claims brought against him. Since the Court is denying Walker's motion for summary judgment on the state law claims, the Court also concludes that the City is not entitled to summary judgment on Plaintiff's indemnification and *respondeat superior* claims.

### B.     Maverick and Moore's Motion for Summary Judgment [322]

### 1.     Section 1983 Failure to Intervene Claim Against Moore

In his Section 1983 failure to intervene claim against Moore, Plaintiff alleges that Moore "stood by without intervening" to prevent Walker from fatally shooting Horton, even though "she had a reasonable opportunity to prevent this harm." [128] at 4. Moore argues that she is entitled

to summary judgment on this claim because (1) she was not acting under color of law, as required to be subject to liability under Section 1983; (2) she did not breach her duty to intervene because she did not have an opportunity to do anything to prevent the shooting; and (3) she is protected by qualified immunity. The Court need not reach the third argument, because Moore prevails on the first and second, entitling her to summary judgment on the failure to intervene claim.

An officer "who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (emphasis in original).; see also *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017); *Patrick v. City of Chicago*, 213 F. Supp. 3d 1033, 1053 (N.D. Ill. 2016). Moore argues that she "did not have any reason to know that the shooting would occur, had no opportunity to prevent it from occurring, and was not deliberately indifferent to Officer Walker's actions." [323] at 11. Plaintiff responds that there is evidence from which a jury could infer that Moore knew Walker was going to shoot Horton—namely, Moore's testimony that, in the moments just before Walker shot Horton, she screamed out "No, no, Oh, my God, oh, my God" in reference to what she understood to be the "climax that was about to occur." [352] at 5. She further testified that she screamed this out because she could tell that something bad was about to happen. *Id*.

Construing the evidence in the light most favorable to Plaintiff, the Court concludes that no reasonable jury could conclude that Moore had a realistic opportunity to intervene to prevent the shooting from occurring. At the earliest, Moore arguably knew at the time she was saying

"No, no, no" that Walker might shoot Horton. However, by Plaintiff's admission, Moore did not make this statement until seconds before Walker shot Horton. Plaintiff does not identify any action that Moore could have taken at that time to prevent the shooting. Calling 911—the only action that Plaintiff faults Moore for not taking—would have accomplished nothing in the short interval before the shooting. Moreover, given Horton's demeanor—which included yanking Moore's braids out of her head and his continued belligerence despite the presence of two armed security officers—Moore could not be faulted for remaining on high alert instead of reaching for her phone.

The Court next considers whether Moore was acting under color of law at the time of the shooting. "While generally employed against government officers, the language of § 1983 authorizes its use against private individuals who exercise government power; that is, those individuals who act 'under color of state law.'" *Johnson v. LaRabida Children's Hosp*., 372 F.3d 894, 896 (7th Cir. 2004) (quoting *Payton v. Rush–Presbyterian–St. Luke's Med. Ctr.,* 184 F.3d 623, 628 (7th Cir. 1999)). A private party will be deemed to have acted under "color of state law" when the state either (1) "effectively directs or controls the actions of the private party such that the state can be held responsible for the private party's decision"; or (2) "delegates a public function to a private entity." *Payton*, 184 F.3d at 628.

Moore, an employee of Maverick (not CPD), argues that she was not acting under color of state law when Horton was shot because (1) there was no transfer to Moore or Maverick of any power or authority traditionally held by the state; (2) Moore had limited powers, no power to arrest, and no direct line of contact to CPD; and (3) Moore did not hold herself out as a police officer. Plaintiff responds that Moore is subject to suit under Section 1983 because "[i]t is enough that [s]he is a willful participant in joint action with the State or its agents" as "'[p]rivate persons, jointly engaged with state officials in the challenged action, are acting 'under color' of law for

purposes of § 1983 actions.'" [352] at 3 (quoting *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980)). Moore disputes this, and argues that her alleged willingness to engage in joint action with a state agent (Walker) is not sufficient to establish joint action without evidence of a planned conspiracy between Moore and Walker.

"A charge of joint action amounts to alleging some agreement between private and public actors to violate plaintiff's constitutional rights." *Cunningham v. Southlake Center for Mental Health, Inc.*, 924 F.2d 106, 107–08 (7th Cir. 1991); see also *L.P. v. Marian Catholic High School*, 852 F.3d 690, 696 (7th Cir. 2017) (charge of joint action "requires 'evidence of a concerted effort between a state actor and that individual'" (quoting *Fries v. Helsper*, 146 F.3d 452, 457 (7th Cir. 1998))). "A requirement of the joint action charge therefore is that both public and private actors share a common, unconstitutional goal." *Cunningham*, 924 F.2d at 107-08. In this case, there is no evidence that Moore had any agreement with Walker to violate Horton's rights. Assuming for present purposes that Moore's exclamation was an expression of concern that Walker was about to fire his weapon—and not just a general statement of panic in the highly charged circumstances of the overall confrontation with Horton—Moore did not suspect that Walker might shoot Horton until a few seconds before the shooting occurred. By that point it was too late to intervene to do anything to stop it. Further, Moore did not hold herself out as a police officer and did not have (or try to exercise) the power to arrest. Compare *Wade v. Byles*, 83 F.3d 902, 905-06 (7th Cir. 1996) (private security guard at CHA building was not performing exclusive state function when he shot plaintiff, and thus guard was not state actor and plaintiff could not maintain § 1983 action against guard and private security company; guard's function as lobby security guard with limited powers was not traditionally exclusive function of state, and contracted security guards were not part of statutorily authorized police force); *Johnson*, *v. LaRabida Children's Hosp.*, 372 F.3d 894 (7th

Cir. 2004) (private security guard not acting under color of law when no evidence of delegated authority and guard "was not expected or authorized to carry out the function of a police officer").

For these reasons, Moore is entitled to summary judgment on Plaintiff's failure to intervene claim.

### 2. State Law Claims Against Moore

Moore argues that she is entitled to summary judgment on Plaintiff's wrongful death and battery claims because she did not cause Horton's death and her only contact with Horton (trying to pull him away from Walker when the two men were on the ground) was in defense of Walker. Plaintiff does not dispute Moore's summary of the facts. However, Plaintiff opposes summary judgment on the basis that, although there is generally "no duty to control the conduct of a third person to prevent him from causing physical harm to another *** this rule does not apply where an act or omission of the defendant *does* contribute to the risk of harm." [352] at 8 (citing *Bruntjen v. Bethalto Pizza, LLC*, 18 N.E.3d 215, 231 (Ill. App. 2014)). Plaintiff contends that "Moore's failure to take action to prevent Walker from engaging in an unjustified killing of Mr. Horton by calling the police as she was expected to do contributed to the risk of harm to Mr. Horton." *Id*.

"Generally, there is no duty to control the conduct of a third person to prevent him from causing physical harm to another." *Bruntjen*, 18 N.E. 3d at 231. "However, this rule does not apply where an act or omission of the defendant does contribute to the risk of harm." *Id*. In such cases, the Court must assess four factors to determine whether the "plaintiff and *** defendant stood in such a relationship to each other that the law imposed an obligation upon the defendant to act for the protection of the plaintiff": "(1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant." *Id*.

The Court concludes that Moore is entitled to summary judgment on Plaintiff's wrongful death and battery claims because there is no evidence that, by failing to call 911, Moore created or contributed to the risk of Walker shooting Horton. Even if Moore conceivably could have done *more* to *diminish* the risk, nothing she did (or did not do) actually *created* or *contributed* to the risk. In contrast, in *Bruntjen*, there was evidence that the employer of a pizza delivery driver, whose vehicle struck a van, actively contributed to the risk that its driver posed to others on the road by maintaining operating policies and procedures that put speed of delivery ahead of safe driving in delivering pizzas. *Bruntjen*, 18 N.E. 3d at 238.

Even if Moore contributed to the risk to Plaintiff by not calling 911, Plaintiff has come forward with insufficient evidence to go to a jury on the question of whether Moore's and Horton's relationship imposed an obligation on Moore to protect Horton, because there is no evidence that Horton's shooting was reasonably foreseeable or that Horton's injury was reasonably likely. Plaintiff contends that Moore should have foreseen "that individuals employed to carry and use weapons might use those weapons to injure others in the course of their employment—it comes with the job of being an armed security guard." [352] at 9. But this is the wrong focus. "The relevant query [is] whether it was reasonably foreseeable that" Moore's actions (*i.e.*, her failure to call 911) "would or could affect the conduct of [Walker], thereby contributing to the risk of harm to [Horton]." *Bruntjen*, 18 N.E. 2d at 232. Plaintiff is silent on that issue, providing no evidence that Moore could or should have predicted that, if she failed to call 911, Walker may be more likely to shoot Horton. Nor is there any evidence that injury to Horton was likely. Walker did not have a history of using excessive force and had never used his weapon or physical force in his job at Maverick. Further, the owner of Maverick Security, Dr. Morris, was not aware of any incident, other than the one with Horton, where a security officer's verbal commands did not control the

incident. The *predictable* outcome of this incident was Horton complying with the security officers' verbal commands.

Finally, Moore's alleged failure to call 911 could not have proximately caused Horton's death, because there is no evidence that Moore had any time to call 911 once she became aware that Walker might use deadly force. For these reasons, the Court concludes that Moore is entitled to summary judgment on Plaintiff's wrongful death and battery claims.

### 3.    Negligent Supervision

In his negligent supervision claim against Maverick, Plaintiff alleges that Maverick "did not adequately supervise its security guards in order to ensure that they did not pose a risk of harm to third parties." [128] at 7. Maverick argues that it is entitled to summary judgment on the negligent supervision claim because Plaintiff cannot establish, as Illinois law requires, that Moore or Walker had any particular unfitness that would have prevented their hiring or retention, or that they had ever behaved in a dangerous or incompetent manner while with Maverick that required supervision or training. Plaintiff fails to address this argument, focusing instead on Maverick's alleged negligence in training and supervising its security guards.

To recover under Illinois law for an employer's alleged breach of the "duty to act reasonably in hiring, supervising, and retaining [its] employees," a "plaintiff must prove that: (1) the defendant-employer knew or should have known that an employee had a particular unfitness for his position so as to create a danger of harm to third persons; (2) that such particular unfitness was known or should have been known at the time of the hiring, retention, or failure to supervise; and (3) that this particular unfitness proximately caused the plaintiff's injury." *Anicich v. Home Depot U.S.A., Inc.*, 852 F.3d 643, 649 (7th Cir. 2017) (quoting *Van Horne v. Muller*, 705 N.E.2d 898, 904 (Ill. 1998)); see also *Van Horne*, 705 N.E. 2d at 721 ("Illinois law recognizes a cause of

action against an employer for negligently hiring, or retaining in its employment, an employee it knew, or should have known, was unfit for the job so as to create a danger of harm to third persons."); *McNerney v. Allamuradov*, 84 N.E.3d 437, 450 (Ill. App. 2017) (same); *Doe v. Brouillette*, 906 N.E.2d 105, 115–16 (Ill. App. 2009)).

Plaintiff does not identify any facts suggesting that, at the time it hired Walker or Moore or at any time after, Maverick knew or should have known that Walker or Moore were unfit to serve as security guards in a manner that created a danger of harm to Horton or other members of the public. Instead, the undisputed facts show that Moore was a duly licensed security guard and held a firearms permit when Maverick hired her; Moore worked at a security guard prior to working for Maverick; Moore passed a criminal background check and drug test prior to her employment at Maverick; and Moore was never subject to any disciplinary action at Maverick or previous employers. Further, in the training for her license and firearms permit, Moore received training regarding the general duties and responsibilities of a security guard, takedown moves, firearms training, handling criminal activity, and the use of force. The record also shows that Walker has been a police officer since 1997 and was a corrections officer prior to that; he was never disciplined by Maverick, CPD, or the Cook County Sheriff's Department; he has never been arrested or charged with a crime; and he graduated from the Chicago Police Academy where he received training on the use of force and weapons. Prior to the incident involving Horton, while working for Maverick, neither Officer Walker nor Moore had never had used physical force with anyone, nor had they ever fired or displayed their weapon in their work for Maverick. Since Plaintiff makes no attempt to show that Moore or Walker were unfit for the security officer job, Maverick is entitled to summary judgment on Plaintiff's negligent supervision claim.

### 4. Respondeat Superior

Plaintiff's r*espondeat superior* claim against Maverick alleges that Maverick is vicariously liable for the actions of its employees Moore and Walker. Since, for the reasons explained above, Walker may be liable to Plaintiff on Plaintiff's state law claims, Maverick is not entitled to summary judgment on the *respondeat superior* claim.

## IV. Conclusion

In sum, for the reasons stated above, summary judgment is granted in favor of Defendant Walker on Plaintiff's excessive force claim; in favor of Defendant Moore on Plaintiff's failure to intervene, wrongful death, and battery claims; and in favor of Defendant Maverick on Plaintiff's negligent supervision claim. Summary judgment is denied as to Plaintiff's state law wrongful death and battery claims against Defendant Walker; Plaintiff's indemnification and *respondeat superior* claims against the City; and Plaintiff's r*espondeat superior* claim against Maverick. As a consequence of these rulings, the only claims remaining in this case arise under state law. The Seventh Circuit consistently has stated that "it is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly Co*., 193 F.3d 496, 501 (7th Cir. 1999). However, in *Wright v. Associated Insurance Cos., Inc*., 29 F.3d 1244 1251-53 (7th Cir. 1994), the Seventh Circuit noted that there occasionally are "unusual cases in which the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point to a federal decision of the state-law claims on the merits." Because the parties did not address this issue in their summary judgment briefs, the Court directs counsel to file supplemental briefs on this issue no later than October 12, 2018. This case is set for status hearing on October 16, 2018 at 9:30 a.m.

Dated:  September 30, 2018

_____
Robert M. Dow, Jr.
United States District Judge