# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JARROD HORTON, as Independent Administrator of the Estate of MARLON HORTON, Deceased,

      Plaintiff,

v.

The CITY OF CHICAGO, a municipal corporation, CHICAGO POLICE OFFICER KENNETH F. WALKER, Star No. 9191, SHAQUILA R. MOORE, The CHICAGO HOUSING AUTHORITY, H.J. RUSSELL & COMPANY, and MAVERICK SECURITY, INC.,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 13-cv-6865

Judge Robert M. Dow, Jr.

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Maverick Security, Inc.'s motion [393] for summary judgment on Counts III through V of H.J. Russell Company's Crossclaim for Contribution, Express Indemnification and Implied Indemnification. For the reasons explained below, Maverick's motion [393] is granted in part and denied in part. Summary judgment is granted in favor of Maverick and against Russell on Russell's claims for express indemnification under the Subcontract (Count III) and on Russell's claim for implied indemnification (Count V). Summary judgment is denied as to Russell's claim for express indemnification under the Service Agreement (Count IV). This case is set for status on December 19, 2018 at 9:00 a.m.

## I.     Background

The Court takes the relevant facts primarily from the parties' Local Rule 56.1 statements, [342], [357], and [376], and the attached exhibits. The following facts are undisputed except where a dispute is noted. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367. Venue is proper under 28 U.S.C. § 1391(b).

This action arises out of the fatal shooting of Jarrod Horton ("Horton") on the morning of September 7, 2013 at a property located at 1815 W. Monroe in Chicago, Illinois (the "Property"). The Property, commonly known under the name of the Henry Horner Homes, is owned by the Defendant Chicago Housing Authority ("CHA"). As detailed below, CHA contracted with Defendant H.J. Russell & Company ("Russell") to manage the Property. Russell subcontracted with Defendant Maverick Security, Inc. ("Maverick") to provide security services at the Property. Two Maverick security guards were on duty at the time of the shooting: Defendant Kenneth Walker ("Walker") and Defendant Shaquila Moore ("Moore"). Walker fired the fatal shot.

This action was filed by Horton's brother and next of kin, Marlon Horton ("Plaintiff") against Walker, Moore, CHA, Russell, and Maverick. As is relevant here, Plaintiff's governing fourth amended complaint alleges a claim against both Russell and Maverick for negligent supervision (Count VIII). See [128] at 7. Plaintiff alleges that because Russell "voluntarily undertook to oversee the management of various functions at the Property, including security, it had a duty to third parties, including [Horton], to use reasonable care in the supervision of security guard services at the Property." *Id*. According to Plaintiff, Russell "knew or should have known that [Maverick] did not adequately supervise its security guards to ensure that the security guards [Maverick] hired to guard the Property did not pose a risk of harm to third parties" and "breached its duty of care to [Horton] by failing to adequate supervise the operations of [Maverick] to provide

security guard services at the Property." *Id.* The fourth amended complaint also includes a claim against Russell, Maverick, CHA, and the City for respondeat superior (Count XII). See *id.* at 10. Plaintiff alleges that, under the doctrine of respondeat superior, Russell is liable as principal for the torts committed by its agents, Walker and Moore. *Id.*

Russell filed crossclaims against the CHA for contribution and against Maverick for contribution (Count II), express indemnification (Counts III and IV), and implied indemnification (Count V). Russell and CHA have settled Russell's contribution crossclaim. See [130]. Currently before the Court is Maverick's motion for summary judgment [393] on Russell's crossclaims. Since the motion was filed, Russell and Maverick have reported that they reached an agreement that obviates the need for a ruling on Russell's contribution crossclaim. Therefore, this opinion will address only Russell's crossclaims against Maverick for express and implied indemnification.

To resolve Maverick's motion, it is necessary to understand the contractual relationship between Maverick and Russell. As stated above, Russell subcontracted with Maverick to provide security services at the Property. In particular, on February 1, 2011, Maverick entered into a Subcontractor Agreement with Russell under which Maverick was to provide security services for locations including the Property, with a listed completion date of January 31, 2012 (the "Subcontract"). The Subcontract required Maverick to provide grounds security and two uniformed security officers at the Property. Although the parties agree that the Subcontract is between Maverick and Russell, see [357] at 3, ¶ 8, the text of the Subcontract provides that it is made "between Maverick Security Agency *** hereinafter called the 'Subcontractor' and Henry Horner/Westhaven Homes, whose principal office is located at, 504 Fair Street, Atlanta, Georgia 30313, hereinafter called the 'Contractor.'" [342-4] at 1 (emphasis added). The Subcontract is signed by Valerie Calloway as representative of Henry Horner/Westhaven Homes, and by Bobby

Morris, the sole owner of Maverick Security. *Id*. at 5. The Subcontract contains an indemnification agreement, which states, in part:

> Vendor agrees to indemnify the Contractor and hold the Contractor harmless from any damages, claims, demands or suits by any person or persons, arising out of or resulting from the execution of the work provided in this subcontract or occurring in connection therewith, excluding liability for negligence of the Contractor, except in connection with general supervision of work performed by Vendor. ***

*Id*. at 2, ¶ 7. Maverick does not dispute that the Subcontract contains this language, but maintains that it does not have any relevance to this lawsuit.

Around January 1, 2013, Russell and Maverick entered into a Letter of Agreement for Maverick to provide security services at the Property (the "Letter Agreement"). The Letter Agreement states that it will remain in effect until December 31, 2013. See [342-5] at 1. Brenda Parker was involved in the negotiation of the Letter Agreement on behalf of Russell. Parker testified that the purpose of the Letter Agreement was to extend the contract for Maverick's provision of security services, as security services did not go back out to bid per the CHA's directive. Parker further testified that the Letter Agreement was intended to document an extension of the original Subcontract. Maverick, citing generally to the Letter Agreement, disputes Parker's testimony about the purpose and intent of the Letter Agreement. Parker also testified that the Letter Agreement did not replace or supersede the Subcontract, but instead "went along with it." [357-2] at 4. Maverick disputes this and asserts that the Letter is a fully integrated document and is the only contract between Maverick and Russell governing their rights and responsibilities from January 1, 2013 through December 31, 2013. In particular, the Letter Agreement provides: "This agreement, including all attachments, constitutes the entire agreement among [Russell and Maverick]. No waiver, changes, or modifications in the Agreement [are] valid or binding unless agreed to in writing and signed by all parties." [342-5] at 1. According to Morris' testimony, there

were no other agreements or contracts that covered Maverick's work with Russell as of September 7, 2013. See [376-1] at 17.

On December 31, 2014—more than fifteen months after Horton was shot—Russell and Maverick entered into a Service Agreement for Maverick to provide patrol services for the Property (the "Service Agreement"). The Service Agreement contains a term of 12 months, renewing automatically, unless terminated by either party with 30 days' prior written notice. The Service Agreement is signed by Morris. The Service Agreement states, in part:

***

WHEREAS, Contractor [Maverick] has continuously provided the Services to the Property since February 1, 2011; and

WHEREAS, Property Manager [Russell] and Contractor are willing to enter into this Agreement to provide such Services and specifically acknowledge and reaffirm that the terms contained herein, to include the indemnification provisions referenced in Article 9 and insurance requirements referenced in Article 8 herein are and were intended to apply to and govern all periods that Contractor has provided Services to the Property, to include all prior periods that Contractor has provided Services;

NOW, THEREFORE, for an in consideration of the sum of TEN and NO/100 DOLLARS ($10.00), in hand paid each to the other, the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

***

9. Contractor shall be financially responsible for all injury or damage of any kind to persons or property, regardless of who may be the owner of the property, resulting from or in relation to the performance of the services contemplated by this Agreement. In addition to the liability imposed upon Contractor on account of personal injury (including, without limitation, death or property damage suffered through Contractor's negligence, which liability is not impaired or otherwise effected hereunder[)], Contractor assumes the obligation to protect, defend, save and hold harmless Property Manager and Owner [CHA] and to indemnify Property Manager and Owner from every expense, liability or payment arising out of or through injury (including, without limitation, death) to any person or persons or damage to property (regardless of who may be the owner of the property) located in any place in which this Agreement is performed, which arises out of or is suffered

5

> through any act or omission of Contractor, any subcontractor of Contractor, or anyone directly or indirectly employed by or under the supervision of any of them in the performance of the services contemplated by this Agreement.

[342-6] at 1, 3-4. Maverick does not dispute that the Service Agreement contains this language, but argues that the indemnification provision has no application or relevance to this lawsuit.

## II.    Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by *** citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532-33 (7th Cir. 2013) (citation omitted).

To avoid summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250. Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Ellis v. CCA of Tennessee LLC,* 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex,* 477 U.S. at 322). The non-moving party "must do more than simply show

that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Liberty Lobby*, 477 U.S. at 252.

## III.    Analysis

### A.    Rules of Contract Interpretation

Russell's claims against Maverick for indemnification are "brought under state law pursuant to [the Court's] supplemental jurisdiction," and therefore the Court "appl[ies] state law to those claims." *Milazzo v. O'Connell*, 925 F. Supp. 1331, 1346 (N.D. Ill. 1996) (citing 28 U.S.C. § 1367; *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)); see also *Timmerman v. Modern Industries, Inc*., 960 F.2d 692, 696 (7th Cir. 1992) ("federal courts exercising pendent or diversity jurisdiction must apply state law to matters of substantive law"). Therefore, the Court will apply Illinois law to Russell's claims that it is entitled to indemnification.

The Court must interpret three contracts in order to resolve the motion for summary judgment. One of the contracts—the Service Agreement, contains a choice of law provision, which provides that Illinois law will govern the contract. The Court will enforce this provision, because there is a "relationship between the parties and the state whose law is to be applied"—the services provided under the contracts were performed in Illinois—and neither party argues that there is anything about the choice of law provision that would be contrary to Illinois public policy. See *Labor Ready, Inc. v. Williams Staffing, LLC*, 149 F. Supp. 2d 398, 405 (N.D. Ill. 2001) ("Under Illinois law, a court will enforce a contractual choice of law provision unless the law to be applied is repugnant to a strong and fundamental policy of Illinois or there is no relationship between the parties and the state whose law is to be applied." (internal quotation marks and citation omitted));

*Freeman v. Williamson*, 890 N.E.2d 1127, 1133 (Ill. App. 2008) ("So long as a choice of law provision does not contravene Illinois public policy and there is some relationship between the chosen forum and the parties to the transaction, an express choice of law provision will be given full effect.").

Two of the contracts—the Subcontract and the Letter Agreement—do not contain choice of law provisions. The parties do not address which state's laws should apply to claims brought to enforce these contracts, but cite to Illinois law in their briefs. The Court concludes that it is appropriate to apply Illinois law, because the security services that were the subject of both contracts were performed in Illinois. See *System Dev. Integration, LLC v. Computer Sciences Corp.*, 739 F. Supp. 2d 1063, 1079–80 (N.D. Ill. 2010) ("Under traditional Illinois conflict of laws principles, the law of the place where the contract is performed and executed is applicable in determining the validity, construction and obligations of the contract. Where performance and execution occur in different states, the law of the place of performance governs." (internal citation and quotation marks omitted)).

Illinois uses the "'four corners' rule in the interpretation of contracts," *Salaita v. Kennedy*, 118 F. Supp. 3d 1068, 1077 (N.D. Ill. 2015) (quoting *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998)), under which the "Court's goal is 'to give effect to the intentions of the parties as expressed in the four corners of the instrument,'" *Salaita*, 118 F. Supp. 3d at 1077 (quoting *Allen v. Cedar Real Estate Grp., LLP*, 236 F.3d 374, 381 (7th Cir. 2001)). Under this approach, the Court's "threshold inquiry is whether the contract is ambiguous." *Bourke*, 159 F.3d at 1036 (citing *Ford v. Dovenmuehle Mortgage Inc.*, 651 N.E.2d 751, 755 (Ill. App. 1995); *Hillenbrand v. Meyer Medical Group, S.C.*, 682 N.E.2d 101, 103 (Ill. App. 1997)). A contract "'is not rendered ambiguous merely because the parties disagree on its meaning.'" *Soarus L.L.C. v.*

*Bolson Materials Int'l Corp.*, 905 F.3d 1009, 1011 (7th Cir. 2018) (quoting *C. Illinois Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 214 (2004) (Ill. 2004)). Rather, to be considered ambiguous, a contract must be "'reasonably susceptible to different constructions.'" *City of Evanston v. Northern Illinois Gas Co.*, 229 F. Supp. 3d 714, 730 (N.D. Ill. 2017) (quoting *Kaplan v. Shure Bros.*, 266 F.3d 598, 605 (7th Cir. 2001)).

If a contract is "'clear and explicit,'" the Court must "'enforce the agreement as written,'" gathering the intention of the parties "'from the face of the document without the assistance of parol evidence or any other extrinsic aids.'" *Cannon v. Burge*, 752 F.3d 1079, 1088 (7th Cir. 2014) (quoting *Rakowski v. Lucente*, 472 N.E.2d 791, 794 (Ill. 1984)); see also *Farm Credit Bank of St. Louis v. Whitlock*, 581 N.E.2d 664, 667 (Ill. 1991) ("The intention of the parties to contract must be determined from the instrument itself, and construction of the instrument where no ambiguity exists is a matter of law."); *City of Evanston*, 229 F. Supp. 3d at 730 ("When a contract's language is unambiguous, the court must give the language its plain and ordinary meaning."). "In contrast, when a contract is ambiguous, construction of the agreement is a question of fact, and the finder of fact may consider parol evidence in determining the intent of the parties." *Cannon*, 752 F.3d at 1088. In sum, to the extent the parties' contracts are unambiguous, the Court must interpret and enforce them according to their terms. But if the contracts are unambiguous, then a jury should be allowed to determine their meaning, using any relevant extrinsic evidence.

### B.    Express Indemnification Under the Subcontract Agreement

Maverick argues that is entitled to summary judgment on Count III, for express indemnification under the Subcontract, because the contract—"besides running to the benefit of Henry Horner/Westhaven Homes as 'Contractor' rather than Russell—does not apply to a claim that arose in September 2013, more than a year and a half after the work described in the 2011

Subcontract *** ended." [341] at 6. Further, Maverick contends, the contract that was in effect at the time of the shooting—the Letter Agreement—does not contain any indemnity agreement and is a fully integrated document that does not incorporate the terms of the Subcontract.

Russell responds that the Subcontract Agreement "was extended to cover the relevant time period in which the shooting death of Marlon Horton occurred." [358] at 1-2. As support, Russell relies on Parker's testimony that Maverick and Horton entered into the Letter Agreement to extend the contract for Maverick's provision of security services and that security services did not go back out to bid. Thus, according to Russell, the Letter Agreement "was intended to go along with the [Subcontract], thereby extending or continuing it as opposed to completely superseding it." *Id*. at 7.

Russell does not respond to Maverick's argument—which Maverick itself never develops—that the Subcontract Agreement "run[s] to the benefit of Henry Horner/Westhaven Homes" rather than Russell. [241] at 6. The Court addresses this issue briefly before turning to the remaining questions raised by the parties' briefs. The Subcontract Agreement identifies Henry Horner/Westhaven Homes, not Russell, as the "Contractor." [342-4] at 5. But Russell admits in its response to Maverick's Local Rule 56.1 statement that the Subcontract Agreement is a contract between itself and Maverick—not Henry Horner/Westhaven Homes and Maverick. See [357] at 3, ¶ 8. This is a judicial admission, which is binding on Russell and has the effect of withdrawing from contention the fact that Russell is a party to the Subcontract Agreement. See *Selimi v. I.N.S.*, 312 F.3d 854, 860 (7th Cir. 2002); *Clausen Miller, P.C. v. Citibank, N.A.*, 738 F. Supp. 2d 850, 854 (N.D. Ill. 2010); cf. *Caterpillar Inc. v. Estate of Lacefield-Cole*, 520 F. Supp. 2d 989, 995–96 (N.D. Ill. 2007) ("Any facts included in a party's statement of facts that are not properly controverted by the opposing party are deemed admitted. Strict compliance with the local rules is

mandatory for practitioners appearing before this court; failure to do so results in a binding judicial admission of fact. These admissions trump evidence that is later produced, let alone evidence that a party claims does not exist at all." (citing Local Rule 56.1)).

Ultimately, however, whether the Subcontract's indemnity provision runs to the benefit of Russell is not dispositive, because the Court agrees with Maverick that the Subcontract was not in effect at the time Horton was fatally shot in September 2013. The Subcontract's "Contract Completion Date" was January 31, 2012, and Maverick agreed to "diligently and continuously prosecute [its] work" under the Subcontract "to completion January 31, 2012." [342-4] at 2, ¶ 5. Nothing in the Subcontract indicates that the parties intended for the contract to remain in effect beyond January 31, 2012. The only evidence that Russell offers to the contrary is Parker's testimony that the later-signed Letter Agreement "was intended to go along with the [Subcontract], thereby extending or continuing it as opposed to completely superseding it." [358] at 7. But Parker's testimony is contrary to the Letter Agreement's integration clause, which expressly provides: "This agreement, including all attachments, constitutes the entire agreement among [Russell and Maverick]. No waiver, changes, or modifications in the Agreement [are] valid or binding unless agreed to in writing and signed by all parties." [342-5] at 1. Russell's brief does not address this integration clause.

Under governing Illinois law, where, as here, the parties to a contract have explicitly agreed that extrinsic evidence is not to be considered part of the contract, the court will enforce the parties' agreement as written and "will not write [an] integration clause out of [a] contract for policy reasons." *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 885-86 (Ill. 1999); see also *In re Marriage of Lewin*, 107 N.E.3d 338, 342 (Ill. App. 2018) ("Where an integration clause is included in an agreement, the four corners rule applies and extrinsic evidence is not admissible to

interpret the agreement.").  Doing otherwise would "ignore[] the express intentions of the parties and render[] integration clauses null." *Air Safety*, 706 N.E.2d at 885.

In this case, the Letter Agreement's integration clause is very similar to the integration clause quoted below, which the Seventh Circuit, applying Illinois law, found to preclude the use of extrinsic evidence to vary the contract's terms: "The only agreements related to this insurance are stated in this policy.  The terms of this policy may not be changed or waived except by endorsement issued by us to be part of this policy." *West Bend Mut. Ins. Co. v. Procaccio Painting & Drywall Co., Inc.*, 794 F.3d 666, 673, 675 (7th Cir. 2015).  As in *West Bend*, the Letter Agreement's integration clause is unambiguous and thus the Court may not consider Parker's testimony that the Letter Agreement was intended to extend or continue the Subcontract.  Russell "was free to negotiate a contract omitting the integration clause," but "did not, and is bound by its bargain." *Air Safety*, 706 N.E.2d at 886.  Since the Letter Agreement does not purport to extend or incorporate the Subcontract's indemnification clause and does not contain its own indemnification clause, the Court concludes that Russell does not have a contractual right to indemnification under either the Subcontract or the Letter Agreement.

## C.    Express Indemnification Under the Service Agreement

Maverick argues that it is also entitled to summary judgment on Russell's crossclaim for express indemnification under the Service Agreement because that contract, which was signed in 2015, did "not validly modify Maverick's 2013 undertakings" to provide security services at the Property.  [393] at 7.  Maverick acknowledges that the recitals to the Service Agreement provide that Russell and Maverick "specifically acknowledge and reaffirm that the terms contained [in the Service Agreement], to include the indemnification provisions referenced in Article 9 *** are and were intended to and govern all periods that [Maverick] has provided Services to the Property, to

include all prior periods that Contract has provided services." [342-6] at 1. But, according to Maverick, this recital imposes no indemnification obligation for the events of September 7, 2013, because "[r]ecitals in a contract are merely explanations for the circumstances surrounding the execution of the contract and are not binding obligations unless incorporated into the agreement portions of the contract." [341] at 7 (citing *McMahon v. Hines*, 697 N.E.2d 1199, 1204 (Ill. App. 1998); *Regnery v. Meyers*, 679 N.E.2d 74, 78 (Ill. App. 1997); *Rubinson v. Rubinson*, 620 N.E.2d 1271, 1276 n.2 (Ill. App. 1993)). Maverick contends that nothing in the substantive terms of the Service Agreement "state[s] that the purportedly retroactive recital is intended to impose binding obligations, nor does any provision incorporate by reference that recital into the body of the agreement." *Id*. at 7-8. Russell responds, in short, that the recital concerning indemnification "merely provides clarity and context for the time period to which" paragraph 9 of the Service Agreement's substantive provisions "was intended to apply," as allowed by governing Illinois law. [358] at 9 (citing *Hagene v. Derek Polling Const.*, 902 N.E.2d 1269, 1274 (Ill. App. 2009)).

Under Illinois contract law, the Court "must 'give effect to all the relevant contractual language to resolve the question of the parties' intent,' and '[t]his includes the contract recitals.'" *Fed'l Deposit Ins., Corp. v. FBOP Corp.*, 252 F. Supp. 3d 664, 702 (N.D. Ill. 2017) (quoting *Hagene*, 902 N.E.2d at 1274). "The Court looks to the recitals 'not as a statement of obligation in itself but as an aid to construing an obligation elsewhere in the contract.'" *Id*. (quoting *Cress v. Recreation Servs., Inc*., 795 N.E.2d 817, 838 (Ill. App. 2003)). In other words, "[t]he contract recitals create a context through which the operational portion of the contract can be better understood, because they indicate the relevant circumstances to its execution." *Hagene*, 902 N.E.2d at 1274 (citing *First Bank & Trust Co. of Illinois v. Village of Orland Hills,* 787 N.E.2d 300, 311 (Ill. App. 2003)). Thus, "'[r]esort will be had to the recitals of a contract if necessary to

determine the intention of the parties and of the operative provisions of the agreement.'" *Cress*, 795 N.E.2d at 838 (quoting *In re Estate of Anderson,* 552 N.E.2d 429, 433 (Ill. App. 1990)).

In this case, because the indemnification provision does not itself identify the time period it covers, resort to the recitals is necessary to determine the intentions of the parties' in agreeing to the indemnification provision. Although, as Maverick repeatedly stresses, the indemnification applies to the "services contemplated by the Service Agreement," this phrase is not defined or otherwise limited to a particular time period. Attachment A to the Service Agreement describes the "Services" covered by the contract, but also does not specify a term. The Service Agreement's fourth recital, however, clarifies that "Contractor [Maverick] has continuously provided the Services to the Property since February 1, 2011." [342-6] at 1. This indicates that the term "Service," as used in the Service Agreement, is not necessarily limited to the period of December 31, 2014 to December 31, 2015, as Maverick contends.

Further, the fifth recital to the Service Agreement states: "Property Manager [Russell] and Contractor [Maverick] are willing to enter into this Agreement to provide such Services and specifically acknowledge and reaffirm that the terms contained herein, to include the indemnification provisions referenced in Article 9 *** are and were intended to apply to and govern all periods that Contractor has provided Services to the Property, to include all prior periods that Contractor has provided Services." *Id*. This recital provides context regarding the "duration and scope" of Maverick's obligation in paragraph 9 to indemnify Russell for certain losses. *Cress*, 795 N.E.2d at 839. It clearly and unambiguously shows that the parties intended the indemnification provision to apply to all prior periods during which Maverick provided services at the Property, back to February 1, 2011.

Maverick argues that referring to the recitals to determine the duration and scope of the indemnification provision is inappropriate under Illinois contract law, because it would impose an obligation on Maverick that is not contained in the substantive terms of the Service Agreement. The Court recognizes that recitals cannot be used to impose new obligations that are not set forth in the body of the contract. But the case law does not clearly delineate a dividing line between using a recital to determine the intention of the parties and using the recital to impose a new, binding obligation.

The most on-point case is *Cress*, which Russell discusses in detail in its response brief and Maverick glosses over in its reply. *Cress* involved a dispute over a deferred compensation agreement between the plaintiff employee and the defendant employer, RSI. 795 N.E. 2d at 829. RSI terminated the plaintiff when he was 61. *Id.* The plaintiff filed suit against RSI for breach of contract and related claims, arguing that his contract contained a guarantee of employment until he reached 65 and a provision for retirement benefits. *Id.* RSI disputed that the contract contained an enforceable promise of employment. *Id.* at 830. Paragraph 10 of the contract contained a provision that obligated the employer not to substantially reduce the plaintiff's salary; there was no time limitation on this obligation. *Id.* at 835. The employment agreement also contained a recital, which stated that the employer "wishes to retain the services of [plaintiff] until his retirement at age sixty five." *Id.* at 838. The court determined that the recital "indicates the duration and scope of RSI's obligation *** to maintain plaintiff's salary" and "agree[d] with plaintiff that paragraph 10, read in light of the recital, evinces the parties' intent that RSI not substantially reduce plaintiff's salary prior to his reaching age 65," which "promise entails, logically, that RSI cannot terminate plaintiff prior to his reaching 65." *Id.* at 839. The court

therefore "conclude[d] that paragraph 10, taken together with the recital, established an enforceable promise on the part of RSI to employ plaintiff at least until he reached age 65." *Id*.

*Cress* supports Russell's argument that the Service Agreement's recitals are properly used to determine the duration and scope of the indemnification obligation that is set forth in the body of the contract. Further, in light of the recitals' clear expression of the parties' intention that paragraph 9 applies to all periods during which Maverick has provided services at the Property—not just the period during which the Service Agreement is in effect—"[i]t would be illogical to ignore the recitals" that "are so indicative of the surrounding circumstances relevant to [paragraph 9's] execution." *First Bank & Tr. Co. of Ill.*,787 N.E.2d at 311. Indeed, Maverick offers no explanation about why the recital is included if it was *not* the parties' intent that the indemnification provision apply to pre-contract conduct.

None of the cases on why Maverick relies are factually similar to this one. In three of those cases, the court rejected a party's attempt to use a recital to establish a substantive legal obligation, *not* to clarify the duration or scope of a legal obligation that was already clearly set forth in the body of the contract. Specifically, in *McMahon*, 697 N.E.2d at 1202, 1204, an easement holder attempted to use a recital to expand an easement "solely for purpose of a driveway" to also include a curb, which served as a gully for water runoff for the servient and dominant estates. In *Regnery*, 679 N.E.2d at 78, defendants attempted to use a recital, which stated that plaintiffs agreed to resolve all claims relating to issuance of a company's stock, to establish that plaintiffs released all claims relating to defendants' purchase of the company's stock, where the words "I release" or "we release" were not found anywhere in the body of the contract. And in *Rubinson*, 620 N.E.2d at 1276-77, a trust beneficiary attempted to use a recital which stated that the settlor was using her trust to express her love for her grandchildren and children to establish an obligation by the trustees

not to divest the beneficiary of her beneficial interest in the trust, even though the body of the contract gave the trustees broad discretion to decide whether and when to pay the trust beneficiaries.

The three other cases cited by Maverick—two of which do not apply Illinois law—rejected parties' arguments that an indemnification provision applied retroactively. But none of those cases involved either a contract recital or any contractual language that indicated any intention on the part of the parties to make the indemnification obligation retroactive. See *St. Michael's Orthodox Catholic Church v. Preferred Risk Mut. Ins. Co.*, 496 N.E.2d 1176, 1178-79 (Ill. App. 1986) (insured failed to show that damage to church caused by roof leakage, occurring prior to effective date of policy, was within coverage of policy, where insured offered no proof that parties agreed to make insurance contract retroactive); *Service Merchandise Co. v. Hunter Fan Co.*, 617 S.E. 235, 239 (Ga. App. 2005) (contract between retailer and manufacturer of air purifiers, which was executed after air purifier involved in wrongful death action was sold, did not apply retroactively and thus manufacturer was not required to indemnify retailer; though contract stated it superseded all prior contracts between retailer and manufacturer, contract also stated that it only applied to purchase orders accepted after the contract's date, and, absent express language to the contrary, a duty for manufacturer to indemnify retailer from retailer's past conduct could not be implied); *DaimlerChrysler Corp. v. Wesco Distribution, Inc.*, 760 N.W.2d 828, 833-34 (Mich. App. 2008) (where industrial accident occurred before contract between manufacturer and electrical services contractor was formed, contractor was not bound by indemnification clause in contract to indemnify manufacturer for damages arising from accident, absent contract language indicating an intent to require indemnification for precontract activity; indemnity clause applied only to work to be performed under the contract, which occurred after the accident).

Maverick does not cite, and the Court is not aware of, any Illinois decision that prohibits a contract from having retroactive effective if that is the intention of the parties. Instead, "Illinois courts have long recognized that '[u]ndoubtedly a contract may have a retrospective operation,'" so long as "the principle of retrospective application [can] be determined from the contract itself." *Janowiak v. Tiesi*, 932 N.E.2d 569, 577 (Ill. App. 2010) (quoting *Bartlett v. Wheeler*, 96 Ill. App. 342, 346 (1901), *aff'd*, 195 Ill. 445, 63 N.E. 169 (1902)); cf. *St. Michael's Orthodox Catholic Church v. Preferred Risk Mut. Ins. Co.*, 496 N.E.2d 1176, 1178–79 (Ill. App. 1986) ("A contract may be made retroactive to cover a pre-existing loss if the parties agree for valuable consideration that the policy shall have that effect.").

Maverick also contends that "any purported modification to the completed contracts for Maverick's services would fail for lack of consideration, because Maverick was not "bestow[ed] any benefit *** in return." See [341] at 8. But the benefit that Maverick received in exchange for its promise is clear: Maverick obtained a new contract with Russell, under which Russell agreed to pay Maverick to continue providing security services. Russell could have refused to sign the contract if Maverick did not agree to extend the indemnification agreement to cover the prior period during which Maverick provided services at the Property. Further, Maverick cannot claim surprise that Russell is attempting to use the indemnification provision to its benefit in this lawsuit. Maverick entered into the Service Agreement more than fifteen months after Horton was fatally injured and more than a year after this lawsuit was filed [1] and Maverick and Russell were issued summonses, [23], [33].

Apart from arguing that the Service Agreement's indemnification provision does not apply to the events of September 7, 2013, Maverick also argues that Russell is not entitled to indemnification for Russell's own alleged wrongful acts. According to Maverick, the Service

Agreement "does not clearly and explicitly indemnify Russell for claims of its own wrongful acts, but purports to indemnify Russell only for liability that arises out of or is suffered through any act or omission of Maverick or Maverick's subcontractors." [341] at 10. According to Maverick, "Plaintiff has sued Russell for *its own* alleged wrongful acts or omissions in performing management duties at the Henry Horner Homes in 2013 \*\*\*, and Maverick has no obligation under the \*\*\* Service Agreement to indemnify Russell for such claims." *Id*. Russell responds that it is entitled to indemnification from Maverick for both of the claims brought against it—*respondeat superior* (Count XII) and negligent supervision (Count VII). As to *respondeat superior*, Russell contends, it is not being sued for its own wrongful acts but rather for the torts committed by Maverick and its security guards. As to negligent supervision, Russell argues, it can be indemnified under Illinois law pursuant to the holding in *Chicago Housing Authority v. Federal Security, Inc.*, 161 F.3d 485 (7th Cir. 1998).

The Court concludes that Russell is entitled to indemnification for Horton's *respondeat superior* claim, because that claim is not based on Russell's own alleged wrongful acts, but instead on the torts committed by Maverick employees Walker and Moore. See [128] at 10. Maverick is simply incorrect that Horton's *respondeat superior* claim against Russell is based on Russell's alleged liability "for the acts of Walker and Moore based upon Horton's claim that they were *Russell's employees*." [375] at 5-6 (citing [128] at ¶¶ 76-77) (emphasis added). The cited paragraphs of the complaint do not allege that Walker and Moore are Russell's employees; instead they state:

> 76. The misconduct alleged above against Defendants WALKER and MOORE was committed within the scope of their employment with and/or within their authorized agency for Defendants H. J. RUSSELL & COMPANY, MAVERICK SECURITY, INC., CHICAGO HOUSING AUTHORITY and the CITY OF CHICAGO.

77. Under the doctrine of respondeat superior, Defendants are liable as the principals for the torts committed by their agents, Defendants WALKER and MOORE, as described more fully above.

[128] at 10. Further, earlier allegations in the complaint clarify Horton's position that Walker and Moore are employees of Maverick, not Russell:

6. At all times relevant hereto, Defendant KENNETH F. WALKER was employed by the Chicago Police Department as a sworn police officer, Star No. 9191, and he was also employed as a security guard for Defendant MAVERICK SECURITY, INC. ***

7. At all times relevant hereto, Defendant SHAQUILA R. MOORE was employed as a security guard for Defendant MAVERICK SECURITY, INC. and was acting within the scope of her employment. Alternatively, at all times relevant hereto, she was acting under color of law as she was asserting police-type powers on behalf of a public entity, DEFENDANT CHICAGO HOUSING AUTHORITY.

[128] at 2. Moreover, Maverick has admitted in its Local Rule 56.1 reply that "Maverick employed Kenneth Walker and Shaquila Moore as security guards." [376] at 2.

In regard to Horton's negligent supervision claim against Russell, the Court agrees with Russell that the Service Agreement's indemnification provision is broad enough to allow Russell to seek indemnification from Maverick for Russell's potential liability on the negligent supervision claim. "Under Illinois law parties may execute an indemnity agreement that encompasses the indemnitee's own negligence, as long as the agreement's language is clear and unequivocal." *Washington Group Int'l, Inc. v. Mason Mfg., Inc.*, 263 F. Supp. 2d 1115, 1118 (N.D. Ill. 2003); see also *Bituminous Cas. Co. v. Plano Molding Co.*, 33 N.E.3d 658, 664 (Ill. App. 2015). "This does not mean that a contract must contain an express provision providing for coverage of the indemnitee's own negligence, only that an indemnity provision, if ambiguous, will not be interpreted in this way." *Washington Group*, 99 F.3d at 1420 (citing *Freislinger v. Emro Propane Co.,* 99 F.3d 1412, 1420 (7th Cir. 1996)); see also *CHA*, 161 F.3d at 487.

*CHA*—a Seventh Circuit case applying Illinois contract law—is on-point and binding on this Court. In that case, two security guards who were employed by FSI and working under a contract for the CHA shot and killed the plaintiff's son. *Id*. at 486. The plaintiff sued the security guards, FSI, and the CHA, alleging that the CHA had negligently hired, trained, and retained FSI as a private security contractor and had acted with deliberate indifference to the safety of her son. *Id*. CHA filed a crossclaim against FSI alleging that FSI breached the parties' contract by failing to indemnify CHA for the plaintiff's claim. *Id*. The indemnification provision in CHA and FSI's contract required FSI "to completely indemnify and hold harmless CHA *** against any liability or expense *** arising out of any losses, claims, damages or injury resulting from any intentional acts or any negligent acts or omissions of [FSI] or its agents in the performance of this contract." *Id*. at 487. The district court held on FSI's motion for summary judgment that CHA was not entitled to indemnification from FSI because Illinois law precluded CHA from seeking indemnification for its own negligent or intentional acts. *Id*. at 486.

The Seventh Circuit reversed. It held that the indemnification provision "required FSI to indemnify the CHA for any claim based on a *respondeat superior* theory," and further that "the 'arising out of' language gives the clause a broader scope, which reaches the particular breed of negligence ascribed to the CHA here." *Id*. at 488. The Seventh Circuit explained that "[t]he claim based on the CHA's negligent failure to use ordinary care in the hiring, training, and retention of FSI required proof that reasonable inquiry would have revealed FSI's own deficiencies," and "[i]n that sense, is grounded on an assertion of FSI's agents' negligent or intentional act." *Id*. The Seventh Circuit concluded that the indemnification provision was "broad enough and explicit enough to allow the CHA's claim of indemnification for its own negligence to go forward" under Illinois law. *Id*. (citing *Duffield v. Marra, Inc*., 520 N.E.2d 938, 944-45 (Ill. App. 1988) (indemnity

agreement which required motel to indemnify railroad for claims asserted against it resulting from use and occupancy of motel rooms by railroad employees was sufficient to require motel to indemnify railroad for sums paid to railroad employee arising from employee's slip while crossing motel parking lot, as employee's injuries were actually caused by acts or omissions of motel and railroad's liability was merely constructive or derivative, "based simply on its non-delegable duty to provide its employees with a safe place to work"); *Ahlvers v. Terminal R.R. Ass'n of St. Louis*, 334 N.E.2d 329, 332-33 (Ill. App. 1975) (provision in contract between railroad and weed sprayer under which sprayer agreed to indemnify railroad for all possible injury to any person, including the railroad and its employees, which results from the acts, omissions, or defaults of sprayer or its employees while performing the agreed-upon service provided for indemnity where railroad employee was sprayed with chemical during weed spraying in railroad's yards even if railroad were partly or jointly responsible for injury to its employee).

The indemnification provision at issue here contains the same type of broad "arising out of" language as the provision at issue in *CHA.* Under the Service Agreement, Maverick assumes the obligation to "indemnify Property Manager [Russell] and Owner [CHA] from every expense, liability or payment arising out of or through injury (including without limitation, death) to any person or persons or damage to property *** which arises out of or is suffered through any act or omission of [Maverick], any subcontractor of [Maverick], or anyone directly or indirectly employed by or under the supervision of any of them in the performance of the services contemplated by this Agreement." [342-6] at 4. Any liability that Russell would owe to Plaintiff on his negligent supervision claim would "arise out of or through injury" to Horton, which "ar[o]se[] out of or [was] suffered through [the] act[s] or omissions of [Maverick and persons] employed by [Maverick]." *Id.* In particular, the negligent supervision claim is based on allegations

22

that Maverick "did not adequately supervise its security guards to ensure that [they] did not pose a risk of harm to third parties" on the Property, which "created a risk of harm to [Horton]," who was shot by Maverick's security guard. [128] at 7, ¶¶ 57-58. Russell's alleged liability, in turn—like the liability of FSI in the *CHA* case—is based on Russell's alleged negligent failure to "use ordinary care in the supervision of [Maverick's] security guard services at the Property." *Id.*, ¶ 55. This claim "required proof that reasonable inquiry would have revealed [Maverick's] own deficiencies," and "[i]n that sense, is grounded on an assertion of [Maverick's] agents' negligent or intentional act." *CHA*, 161 F.3d at 488.

Maverick attempts to distinguish *CHA* on the basis that the Seventh Circuit "allowed the indemnity claim 'to go forward' because the court believed the CHA's alleged wrongdoing was grounded in the security company's negligent acts and the guard's 'illegal activity' and, thus, interpreting the indemnity agreement to require the security company to indemnify the CHA would merely require the primary wrongdoer to bear the financial burden of its actions." [375] at 10. Maverick argues that this case is different because Maverick moved for summary judgment on Horton's claims against it and "expects the Court will find that Maverick, Moore, and Walker did nothing wrong," and therefore "forcing Maverick to retroactively indemnify Russell for Russell's own conduct would be contrary to the 2015 Service Agreement and Illinois law." *Id.* However, the Court denied summary judgment on Plaintiff's state law claims against Moore and Plaintiff's respondeat superior claim against Maverick, and therefore it is still an open question whether Moore engaged in any wrongdoing.

For these reasons, the Court concludes that the Service Agreement's indemnification obligation does apply to the claims that Plaintiff brought against Russell and, therefore, Maverick is not entitled to summary judgment on Count IV of Russell's crossclaims.

### D.     Implied Indemnification

Maverick makes several arguments as to why summary judgment should be granted in its favor on Russell's implied indemnification claim. The Court need not address these arguments, however, because Russell's claim for implied indemnification fails for the fundamental reason that there is already an express indemnification provision, contained in the Service Agreement, that governs the subject matter at issue here. "[I]mplied indemnity claims are appropriate where the 'parties have failed to include an indemnity provision in an agreement and there is reason for the court to read such a provision into the agreement,' not where, as here, the parties have already negotiated and agreed to an indemnity provision." *UIRC–GSA Holdings Inc. v. William Blair & Company, L.L.C.*, 289 F. Supp. 3d 852, 862 (N.D. Ill. 2018) (quoting *Mizuho Corp. Bank (USA) v. Cory & Associates, Inc*., 341 F.3d 644, 652 (7th Cir. 2003)); cf. *Tiffiny Decorating Co. v. General Acc. Fire & Life Assur. Corp., Ltd*., 299 N.E.2d 378, 381 (Ill. App. 1973) ("a right to indemnity, *absent an express contractual undertaking*, may be implied from the terms of the contract governing job responsibility or from the relationship of the parties to the particular work being done at the time the injuries were received" (emphasis added)). This conclusion is consistent with the more general principle of contract law that "[i]f an express contract exists between the parties concerning the same subject matter, a party cannot assert a claim on a contract implied in law." *Schroeder v. Sullivan*, 104 N.E.3d 460, 472 (Ill. App. 2018) (internal quotation marks and citation omitted); see also *Karen Stavins Enterprises, Inc. v. Community College Dist. No. 508*, 36 N.E.3d 1015, 1018 (Ill. App. 2015) ("No claim of a contract implied in law can be asserted when an express contract or a contract implied in fact exists between the parties and concerns the same subject matter."); *Riley Acquisitions, Inc. v. Drexler*, 946 N.E.2d 957, 967 (Ill. App. 2011) ("Implied indemnity is a contract implied in law arising from the legal obligation of an indemnitee

* * * to satisfy liability caused by actions of his indemnitor." (internal quotation marks and citation omitted)). Therefore, Maverick is entitled to summary judgment on Count V of Russell's crossclaims.

## IV. Conclusion

For these reasons, Maverick's motion for summary judgment [393] is granted in part and denied in part. Summary judgment is granted in favor of Maverick and against Russell on Russell's claims for express indemnification under the Subcontract (Count III) and on Russell's claim for implied indemnification (Count V). Summary judgment is denied as to Russell's claim for express indemnification under the Service Agreement (Count IV). This case is set for status on December 19, 2018 at 9:00 a.m.

Dated: December 11, 2018

Robert M. Dow, Jr.
United States District Judge